# Exhibit A

# SETTLEMENT AND FORBEARANCE AGREEMENT

This Settlement and Forbearance Agreement (the "**Agreement**") dated as of May 7, 2020, (the "**Effective Date**"), is entered into by and between High Brass Land Holdings, LLC ("**HB Land**") with an address at 68 Sky Manor Road, Pittstown, New Jersey 08887, High Brass Farm LLC ("**HB Farm**"), Michael Merbler ("**M. Merbler**"), and Elizabeth Perry-Merbler ("**E. Merbler**")(HB Land, HB Farm, M. Merbler, and E. Merbler are hereinafter sometimes referred to collectively as "**Obligors**") and Bank of America, N.A. ("**BofA**")(Obligors and BofA are sometimes referred to individually as a "**Party**" and collectively referred to as the "**Parties**").

## RECITALS

### I.    The 2008 Credit Facilities

A.    On April 21, 2008, BofA extended three credit facilities to HB Land and HB Farm (collectively the "**Borrowers**").

B.    BofA extended a commercial mortgage term loan to HB Land, in the original principal sum of $1,320,000 (the "**2008 Mortgage Loan**"). The 2008 Mortgage Loan was evidenced by a certain Loan Agreement, dated April 21, 2008, in favor of Debtor (the "**2008 Mortgage Loan Agreement**").

C.    BofA also extended a commercial term loan to HB Land, in the original principal sum of $100,000 (the "**2008 Term Loan**"). The 2008 Term Loan was evidenced by a certain Loan Agreement, dated April 21, 2008, in favor of Debtor (the "**2008 Term Loan Agreement**").

D.    BofA also extended a commercial line of credit to HB Farm, in the original principal sum of $150,000 (the "**2008 LOC**") (the 2008 Mortgage Loan, 2008 Term Loan, and 2008 LOC are hereafter collectively referred to as the "**2008 Loans**"). The 2008 LOC was evidenced by a certain Loan Agreement, dated April 21, 2008, in favor of HB Farm (the "**2008 LOC Agreement**").

E.    Each of the 2008 Loans were secured by a separate "Mortgage, Assignment of Rents, Security Agreement and Fixture Filing" (collectively the "**2008 Mortgages**"), each of which encumbered real property located at 68 Sky View Manor Road, Pittstown, New Jersey 08867 (Tax Lot 38 & 38Q0231, Block 21, Township of Alexandria, County of Hunterdon)(the "**Mortgaged Premises**").

F.    Pursuant to the terms of the 2008 LOC Agreement, the 2008 LOC expired on April 21, 2009 (the "**2008 LOC Maturity Date**"), at which time all amounts advanced on the 2008 LOC would become due and owing. Thereafter, the 2008 LOC Maturity Date was extended to June 21, 2009.

G.    Borrowers failed to the pay the 2008 LOC in full on the extended 2008 LOC Maturity Date, and were therefore in default under the terms of the 2008 LOC. As a result of this default, Borrowers were also in default on the 2008 Mortgage Loan and 2008 Term Loan due to cross-

default provisions contained in the 2008 Mortgage Loan Agreement and 2008 Term Loan Agreement (collectively the "**2008 Loan Defaults**").

## II.  The 2010 Recast of the 2008 Loans

A.    Borrowers and BofA resolved the 2008 Loan Defaults by consolidating the 2008 Loans into a single debt obligation (hereinafter the "**2010 Loan**") secured by a single mortgage encumbering the Mortgaged Premises.

B.    On July 19, 2010, BofA and Borrowers entered into a new Loan Agreement in the face amount of $1,510,000, which consolidated the amounts due under the 2008 Loans (hereinafter the "**2010 Loan Agreement**").

C.  In connection with the 2010 Loan Agreement, BofA credited Borrowers' DDA Account in the amount of $8,010.64. Additionally, the 2010 Loan Agreement consolidated the outstanding balances owed on the 2008 Loans, fixed the interest rate, extended the applicable maturity date, and capitalized the amount $29,343.50, representing all outstanding fees and closing costs owed to BofA.

D.    Integrated into the 2010 Loan Agreement, and in consideration for BofA agreeing to consolidate, amend, and extend the terms of the 2008 Loans, Borrowers released BofA of any and all claims and/or defenses.

E.    On July 19, 2010, as security for the payment of the Borrowers' obligations owed under the 2010 Loan Agreement, M. Merbler and E. Merbler (collectively the "**Guarantors**") each executed and delivered to BofA, a certain "Continuing and Unconditional Guaranty" (collectively the "**Guaranties**") whereby the Guarantors absolutely and unconditionally guaranteed the payment of Borrowers' obligations under the 2010 Loan Agreement, and any other indebtedness owed by Borrowers to BofA.

F.    On July 19, 2010, as further security for the payment of Borrowers' obligations owed under the 2010 Loan Agreement, HB Land executed and delivered to BofA, a certain "Mortgage, Assignment of Rents, Security Agreement and Fixture Filing" in the face amount of $1,510,000 (the "**Mortgage**"), which is secured by the Mortgage Premises.

## III.  The 2016 Loan Modification

A.    On April 5, 2016, BofA and Borrowers entered into a certain "Loan Modification Agreement" (the "**Loan Modification**").

B.    Similar to the 2010 Loan Agreement and Guaranties, the Loan Modification also waived and released BofA of any and all claims or defenses.

C.     Among other changes, the Loan Modification: (a) extended the Maturity Date of the 2010 Loan Agreement to February 28, 2019; (b) reduced the applicable interest rate to 5.25% per annum; and (c) amended the repayment terms under the 2010 Loan Agreement.

D.     On May 23, 2016, BofA and Debtor entered into a certain "Modification Agreement (Mortgage)" (the "**Mortgage Modification**"). The Mortgage Modification incorporated the Loan Modification and amended the street address for the Mortgaged Premises to 68 Sky Manor Road, Pittstown, New Jersey 08867. The 2010 Loan Agreement, Guaranties, Mortgage, Loan Modification, and Mortgage Modification are collectively the "**2010 Loan Documents".**

## IV.  **Default and Amount Due**

A.     An event of default occurred under the 2010 Loan Agreement, as amended, due to Borrowers' failure to make the required monthly installment payment on November 21, 2018, and for each month thereafter (the "**Payment Default**").

B.     An event of default occurred under the 2010 Loan Agreement and Mortgage, as amended, due to Borrowers' failure to pay real estate taxes for the Mortgaged Premises, as required by Paragraph 5.2 of the Mortgage (the "**Tax Default**").

C.     An event of default occurred under the 2010 Loan Agreement, as amended, due to Borrowers' failure to pay the amounts due on the Loan on the February 28, 2019 Maturity Date (the "**Maturity Default**")(the Payment Default, Tax Default, and Maturity Default are hereinafter referred to as the "**Stated Defaults**").

D.     Borrowers and Guarantors failed to cure the Stated Defaults, and by correspondence dated March 4, 2019 (the "**Demand Letter**"), BofA declared the defaults, and advised Borrowers that all amounts due and owing to BofA were immediately due and payable.

## V.  **The State Court Action**

A.     On December 13, 2018, HB Land and Guarantors (collectively HB Land and Guarantors are hereinafter referred to as the "**State Court Plaintiffs**") filed a complaint (the "**State Court Action**") against Sky Manor Airport Partners, LLC, Fidelity National Title Insurance Company of New York ("**Fidelity**"), and New Jersey Title Insurance Company n/d/b/a Catico Title Insurance Company ("**Catico**").

B.     State Court Plaintiffs asserted causes of action against Sky Manor for quiet title and for trespass. State Court Plaintiffs contended that they possess an express and/or an implied easement to access the Mortgaged Premises by way of a shared driveway with Sky Manor.

C.     Sky Manor counterclaimed against State Court Plaintiffs for quiet title and trespass based on the theory that HB Land did not possess a recorded easement through Sky Manor's property, and by virtue thereof, HB Land's continued use of the shared driveway constituted a trespass.

D.    On April 24, 2019, BofA moved to intervene in the State Court Action in order to protect its rights with respect to the Mortgaged Premises, and to assert claims against State Court Plaintiffs and Catico. On May 10, 2019, the Court granted BofA's Motion to Intervene.

E.    On May 20, 2019, in accordance with the May 10, 2019 Order, BofA filed a "Verified Answer, Cross-Claims, Counterclaims and Third-Party Complaint" (the "**BofA Pleading**"). BofA asserted counterclaims against the State Court Plaintiffs for collection of the amounts due and owing under the applicable Loan Documents (the "**Counterclaims**"), and also asserted a third-party complaint (the "**Third-Party Complaint**") against HB Farm.

F.    On June 25, 2019, State Court Plaintiffs filed an answer to the Counterclaims; however HB Farm did not file a pleading in response to the Third-Party Complaint.

## VI.    **The Bankruptcy Action, Referral to Mediation, and Adversary Complaint**

A.    On August 7, 2019, HB Land filed a Chapter 11 Bankruptcy Petition (the "**Bankruptcy Action**"). The Bankruptcy Action is a single asset real estate case because HB Land is the holding company for the Mortgaged Premises, and other than the Mortgaged Premises, HB Land has no other assets.

B.    On August 15, 2019, HB Land filed a "Notice of Removal" which removed the State Court Action from the New Jersey Superior Court, to the Bankruptcy Court (hereinafter the State Court Action shall be referred to as the "**Removed Proceedings**").

C.    On October 18, 2019, HB Land filed a Complaint against BofA (the "**Adversary Complaint**") under Case No. 19-02190. In its Adversary Complaint, HB Land generally seeks to rescind or reform the terms of the 2010 Loan Agreement by virtue of an alleged unilateral and/or mutual mistake with respect to the lack of an easement providing ingress and egress at the Mortgaged Premises, and claiming that the Mortgaged Premises is landlocked, with no legal access, thereby making the Mortgaged Premises unmarketable.

D.    On October 23, 2019, BofA moved to for summary judgment against Guarantors, and for default judgment against HB Farm with respect to BofA's collection claims asserted in the Removed Proceedings.

E.    On October 28, 2019, the Court entered a certain Amended Order Providing for Referral of Adversary Proceeding to Mediation (the "**Mediation Order**"). The Mediation Order provides that the easement claims between HB Land and Sky Manor would be referred to mediation before Anthony Sodono, Esq.

F.    On December 23, 2019, HB Land moved to amend the Adversary Complaint. HB Land seeks to add claims: (i) objecting to BofA's legal fees and costs; (ii) for surcharge of BofA's interest; (iii) for violation of New Jersey's Consumer Fraud Act; (iv) for common law fraud and (v) for equitable subordination.

G.    On December 23, 2019, Guarantors and HB Farm also moved to amend their

Complaint in the Removed Proceedings to assert new claims against BofA based on consumer predatory lending theories.

H.    On December 27, 2019, BofA moved to dismiss the Bankruptcy Action.

I.    On January 14, 2020, BofA moved to dismiss the Adversary Complaint.

J.    On January 15, 2020, HB Farm moved to extend the applicable proof of claim deadline so as to assert a $165,355.00 proof of claim against HB Land for improvement and maintenance costs.

## VII.    The Settlement Between HB Land and Sky Manor, and Proposed Sale of the Mortgage Premises

A.    On January 27, 2020, HB Land filed a Rule 9019 Motion to have the Court approve a certain "Settlement Agreement" (the "**Proposed Settlement**") negotiated and entered into by and between HB Land and Sky Manor.

B.    The Proposed Settlement memorializes the resolution of the easement and maintenance dispute between HB Land and Sky Manor by essentially providing for a perpetual, non-exclusive access easement to the Mortgaged Premises via a partially paved and partially gravel driveway through Sky Manor's property (the "**Driveway Access Easement Area**") and a corresponding maintenance agreement, among other less material issues (the "**Easement and Maintenance Agreement**"). A copy of the Easement and Maintenance Agreement is attached hereto as *Schedule I.*

C.    Sky Manor included a provision in the proposed Settlement requiring BofA's approval of the Easement and Maintenance Agreement because BofA holds the Mortgage on the Mortgaged Premises. Any recorded Easement and Maintenance Agreement will be subject to the Mortgage, unless BofA agrees to subordinate the Mortgage in favor of the Easement and Maintenance Agreement, so BofA must agree to the terms of the proposed Settlement.

D.    On or about February 11, 2020, HB Land received a $1.3 million offer for the purchase of the Mortgaged Premises which requires approval from BofA as the proposed sale will not satisfy the amounts presently due and owing to BofA (the "**Offer of Sale**").

E.    Each of the above referenced motions remain pending with the Bankruptcy Court before the Hon. Michael B. Kaplan.

F.    As of April 9, 2020, the amount due under the 2010 Loan Documents, is $1,679,073.40 (comprised of principal in the amount of $1,354,469.54, interest in the amount of $105,874.35, default interest in the amount of $114,226.92, reconveyance fee for mortgage $95, UCC Terminations of $40 appraisal fees in the amount of $5,000, legal fees in the amount of $102,773.60 as of March 31, 2020 and costs in the amount of $1,593.99 as of January 2, 2020, plus per diem interest at the contract rate of $197.53 and default interest at the rate of $225.74 for

April 10, 2020 and each day thereafter (the "**Total Indebtedness**"). Unpaid taxes on the Mortgaged Premises are also due and owing in the amount of $40,975.07.

G. Pursuant to Obligors' request, although it is under no obligation to do so, BofA is willing to forbear from exercising its rights and remedies under the 2010 Loan Documents for a period of time as specified herein and on the terms and conditions set forth herein, and BofA has agreed to such request provided Obligors' comply with the terms and conditions provided for herein.

## AGREEMENT

Now, therefore, in consideration of the premises and the mutual agreements contained herein, the parties agree as follows:

1. DEFINED TERMS. Unless otherwise defined in this Agreement, all capitalized terms used herein as defined terms shall have the meanings given to them in the Recitals.

2. TERMS OF SETTLEMENT AND FORBEARANCE. Unless the Forbearance Period (as defined below) is sooner terminated as provided herein, BofA agrees to forbear from exercising its rights and remedies under the 2010 Loan Documents from the Effective Date of this Agreement through the close of business on October 31, 2020 (the "**Forbearance Period**") on the following terms and conditions (Unless specifically modified herein, all terms, conditions and covenants contained in the 2010 Loan Documents shall be and remain in full force and effect.):

**Sale of Mortgaged Premises Pursuant to 11 U.S. Code §363 and Deed-in-lieu of Foreclosure**

2.1. Prior to and as a condition precedent to the execution of this Agreement, HB Land shall have entered into a certain Agreement of Sale (a copy of the fully executed Agreement of Sale shall be attached hereto as *Schedule II)* for the sale of the Mortgaged Premises from HB Land to EVS Family Brass Farm LLC (the "**Buyer**") (the "**Sale Transaction**"). This Agreement is conditioned upon the Agreement of Sale being fully executed and the required deposits being made thereunder prior to execution hereof.

2.2. Upon execution of the Agreement of Sale, HB Land shall file a Motion to Approve the Sale of Real Property (the Mortgaged Premises) Pursuant to 11 U.S. Code §363 free and clear of all liens, claims and encumbrances (the "**Sale Motion**"). The Sale Motion shall be made on short notice, and HB Land shall bear all legal fees, costs and expenses associated with the Sale Motion.

2.3. All proceeds of the Sale Transaction shall be paid to BofA, subject only to (1) ordinary closing costs and adjustments (including unpaid real property taxes), which shall be subject to the final review and approval of BofA, which shall not be unreasonably withheld (the "Net Sale Proceeds"), (2) payment of Five Thousand and 00/100 Dollars ($5,000.00) Dollars to

Obermayer, Rebmann Maxwell & Hippel, LLP ("**ORMH**") as attorneys for HB Land for legal fees incurred in connection with the Sale Transaction, (3) payment of Seventy-Five Thousand and 00/100 Dollars ($75,000.00) to ORMH as a carve-out from BofA's net proceeds, for legal fees incurred by ORMH in connection with ORMH's legal work on behalf of HB Land related to the Easement and Maintenance Agreement. The Sale Transaction is subject to BofA's review and approval of the Closing Statement, which approval shall not be unreasonably withheld.

2.4     HB Land, ORMH, HB Farm, Guarantors and Courtney Schael, Esq. waive any right to the payment of any other amounts from the proceeds of the Sale Transaction, including any right to any surcharge of BofA's interest in the proceeds or BofA's collateral in any respect.

2.5     Upon execution of this Agreement, HB Land shall deliver to BofA (or BofA's designee Second Step Asset Management Company) a fully executed, transferable deed-in-lieu of foreclosure (the "**Deed-In-Lieu**"), along with any and all supporting documents required for BofA (or BofA's designee Second Step Asset Management Company) to record the Deed-in-Lieu to obviate BofA's need to commence and complete a foreclosure and foreclosure sale of the Mortgaged Premises, in the event that the Sale Transaction does not close by July 31, 2020. The form of Deed-in-Lieu is attached hereto as *Schedule III*. BofA (or BofA's designee Second Step Asset Management Company) shall hold the Deed-in-Lieu in escrow until HB Land and Buyer confirm that the Sale Transaction is terminated or July 31, 2020, whichever occurs earlier. Additionally, should HB Land default on this Agreement in any respect prior to completion of the Sale Transaction, the escrow shall automatically be broken, the Deed-In-Lieu shall be released to BofA (or BofA's designee Second Step Asset Management Company) and BofA (or BofA's designee Second Step Asset Management Company) shall be permitted to record the Deed-In-Lieu in the Hunterdon County land records and take title to the Mortgaged Premises in its sole discretion, as set forth below. If Borrowers fully comply with the terms and conditions set forth herein, or upon the closing of the Sale Transaction and payment of the Net Sale Proceeds to BofA, BofA shall destroy the Deed-In-Lieu.

In the event that BofA elects to not record the Deed-In-Lieu following termination of the Sale Transaction, July 31, 2020 or a default hereunder, and instead elects to initiate a foreclosure action with respect to the Mortgaged Premises, as material consideration for entering into this Agreement, Obligors agree to waive any and all claims and/or defenses with respect to any foreclosure action initiated by BofA. Furthermore, Obligors consent to accept service of process for any foreclosure action by and through their counsel of record as set forth in this Agreement – Ms. Schael for HB Farm and Guarantors and Mr. George for HB Land. Upon the filing of a foreclosure action, Obligors' counsel will accept service of the applicable pleadings and will acknowledge service of the pleadings in writing. To the extent that Obligors file a contesting pleading with respect to any foreclosure action initiated by BofA, Obligors' expressly consent to the entry of an order striking the contesting pleading. BofA shall be authorized to proceed with a foreclosure action in an uncontested manner in accordance with N.J. Court Rule 4:64-1. BofA shall be permitted to make application to the Court for final judgment in an amount equal to the Total Indebtedness (plus any additional interest, advances, and/or any other amounts coming due as permitted under the Loan Documents), and proceed with a sheriff sale of the Mortgaged Premises on an uncontested basis.

As material consideration for entering into this Agreement, Obligors waive any and all rights, pursuant to New Jersey "Fair Foreclosure Act", including, but not limited to, the right to any notice of default, the right to cure, and the right, pursuant to <u>N.J.S.A.</u> 2A:17-36 and R. 4:64-4, to request and obtain adjournment(s) of any sheriff sale of the Mortgaged Premises.

If any of the Obligors contest BofA's foreclosure action, Obligors shall be in default under the terms of the Agreement.

2.6     The interest created by the Deed-in-Lieu shall not be merged with the interest created by the Mortgage. BofA shall maintain the ability to prosecute a foreclosure action and sale (if necessary), along with any other relief provided for by the Loan Documents and/or this Agreement or by law in order to obtain clear and unencumbered title to the Mortgaged Premises, subject to the terms and conditions hereof.

2.7     Prior to BofA recording the Deed-in-Lieu, BofA shall provide HB Farm and Guarantors with thirty five (35) days' notice to vacate the Mortgaged Premises. Within five (5) days of receipt of the notice, HB Farms shall notify all tenants, subtenants, occupants and/or lessees (collectively the "Subtenants") to vacate the Mortgaged Premises within thirty (30) days thereafter, as permitted by law. The Mortgaged Premises shall be completely vacated by HB Farm and Guarantors (and any Subtenants of any kind) following the expiration of thirty five (35) days from BofA's notice to vacate. In the event that HB Farm and/or Guarantors (and any Subtenants of any kind) have not vacated the Mortgaged Premises following thirty five (35) days' notice, HB Farm and Guarantors consent to an Order of Ejectment, or an eviction and Warrant of Removal or a Writ of Possession, as the case may be, and agree not to oppose any such relief requested by BofA to remove HB Farm, Guarantors (and any Subtenants of any kind) from the Mortgaged Premises.

HB Farm and Guarantors acknowledge that there are no Subtenants on the Mortgaged Premises, except for Robert Meyer (unit B), Philip John Luzny and Dayna Fennimore (unit C), John W. Leatherdale (unit D), Olga Kotzhukhov, Olivia Hallman, Mimi Chapman, Linda Montemarano, Leah Samouhos, and Elizabeth Moak and HB Farm and Guarantors will not permit any new Subtenants of any kind on the Mortgaged Premises after execution of this Agreement. Obligors further acknowledge and affirm no leases or any other contracts exist for any leasing of any portion of the Mortgaged Premises, including but not limited to the commercial farm buildings, residential houses and/or stalls for horses, except for written leases the terms of which have expired for Robert Meyer (unit B), Philip John Luzny and Dayna Fennimore (unit C) and John W. Leatherdale (unit D) and stalls for horses for Olga Kotzhukhov, Olivia Hallman, Mimi Chapman, Linda Montemarano, Leah Samouhos, and Elizabeth Moak. If any Subtenants of any kind remain on the Mortgaged Premises after the notice to vacate, BofA, may proceed to record the Deed-in-Lieu or proceed with a Foreclosure Action in its sole and exclusive discretion. At any time after BofA notifies HB Farm and Guarantor to vacate the Mortgaged Premises BofA shall be entitled to have its designated Property Manager or any other designee, inspect the Mortgaged Premises for any purpose on twenty-four (24) hours' notice to HB Farm and Guarantors.

2.8     During the term of the Forbearance Period, until completion of the Sale Transaction and payment of the Net Sale Proceeds to BofA, HB Land shall provide BofA's designee access to the Mortgaged Premises to conduct appraisals and/or environmental inspections as requested by BofA in its sole and exclusive discretion. Upon termination of the Sale Transaction, expiration of July 31, 2020 or a default hereunder, BofA (or BofA's designee Second Step Asset Management Company) shall be permitted immediate access to the Mortgaged Premises to conduct inspections of same, including, but not limited to, a complete property inspection by BofA's designated Property Manager, and/or a Phase I and/or a Phase II environmental inspection through a designee of BofA's choice, including inspections to sample soil and/or water (as necessary) (the "Environmental Inspections"). Upon completion of the Environmental Inspections (as necessary), BofA shall be entitled, in its sole and exclusive discretion, to immediately record the Deed-in-Lieu and supporting documents. However, irrespective of the results of the property inspection and/or the environmental inspections, BofA may elect not to record the Deed-In-Lieu and/or may elect to proceed with a foreclosure, as it deems appropriate in its sole and exclusive discretion. BofA shall have no obligation to record the Deed-In-Lieu or to complete the foreclosure process.

2.9     Immediately after the Court grants the Sale Motion, HB Land shall move (and/or stipulate) to dismiss the Bankruptcy Action (and all Adversary Complaints), and shall not move to reinstate the Bankruptcy Action, or re-file for bankruptcy under any circumstances. Any and all funds in HB Land's bankruptcy estate, including any funds in HB Land's debtor-in-possession account, will be immediately turned over to BofA to be applied to BofA's outstanding indebtedness.

2.10     Immediately after HB Land dismisses the Bankruptcy Action (and all Adversary Complaints), Obligors and BofA shall execute a certain Stipulation of Dismissal as to all claims in the State Court Action by Obligors against BofA, *with prejudice* and same shall be immediately filed with Hunterdon County clerk A copy of the form of Stipulation of Dismissal is attached hereto as *Schedule IV*.

**BofA's Agreement to Easement and Maintenance Agreement**

2.11     By virtue of BofA's execution of this Agreement, BofA consents to the terms and conditions set forth in the Easement and Maintenance Agreement, except to the extent that the Bankruptcy Court retains jurisdiction. As needed, BofA will inform the Court of its approval of the Easement and Maintenance Agreement in conjunction with the Sale Motion, except for the Bankruptcy Court's retention of jurisdiction and shall subordinate its Mortgage to the Easement and Maintenance Agreement, as modified by so informing the Bankruptcy Court in connection with the pending 9019 Motion to Approve Settlement.

2.12     Upon execution of this Agreement, HB Land and Sky Manor shall fully execute the Easement and Maintenance Agreement (to the extent not already accomplished), except for the Bankruptcy Court's retention of jurisdiction which shall be stricken from the Easement and Maintenance Agreement and HB Land shall submit the Easement and Maintenance Agreement for recording with the Hunterdon County Clerk, at HB Land's and Sky Manor's sole cost and expense. Subject to the modification that the Bankruptcy Court shall not retain jurisdiction and

Paragraph 10, 11 and 23 of the Settlement Agreement will be stricken, the pending 9019 motion to approve settlement shall be decided on May 7, 2020 contemporaneously with the 9019 motion to approve this Agreement and the 363 sale motion related to the Mortgaged Premises.

### HB Farm Deficiency Balance and Liquidation of Assets for the Benefit of BofA

2.13.    Upon completion of the Sale Transaction and payment of the Net Sale Proceeds, there will be a deficiency balance due on the Loan based on the agreed fair market value credit of One Million Four Hundred Thousand and 00/100 Dollars ($1,400,000.00) (which is the current appraised value of the Mortgaged Premises) in the amount of $279,073.40 (hereinafter the "**Deficiency Balance**").  The Deficiency Balance shall be due and payable from all Borrowers, except as set forth herein.

2.14    The amount of the Deficiency Balance due from HB Farm shall be capped in the amount of Twenty Thousand and 00/100 Dollars ($20,000.00). HB Farm shall execute a Consent Judgment in the amount of Twenty Thousand and 00/100 ($20,000.00) ("**HB Farm Capped Deficiency Balance**") in favor of BofA, which BofA will hold in escrow pursuant hereto (the "**HB Farm Consent Judgment**") and HB Farm agrees that BofA shall have a blanket security interest in all of HB Farm business assets as described in more detail below, and this Agreement shall serve as a Security Agreement for purposes of perfection under the NJ UCC.  BofA shall be authorized to file a UCC-1 Financing Statement against all business assets of HB Farm, described as follows:

    (a) All accounts, and all chattel paper, instruments, deposit accounts, letters of credit rights, and general intangibles related thereto, and all returned or repossessed goods which, on sale or lease, resulted in an account.
    (b) All inventory.
    (c) All Equipment and fixtures now owned or hereafter acquired by HB Farm.
    (d) All negotiable and nonnegotiable documents of title covering any of HB Farm business assets.
    (e) All accessions, attachments and other additions to the HB Farm Business Assets, and all tools, parts and equipment used in connection with the HB Farm Business Assets.
    (f) All substitutes or replacements for any HB Farm Business Assets, all cash or non-cash proceeds (including insurance proceeds), products, rents and profits of the HB Farm Business Assets, and all income, benefits and property receivable on account of the HB Farm Business Assets, and all supporting obligations covering any HB Farm Business Assets.
    (g) All books, data and records pertaining to any HB Farm Business Assets, whether in the form of a writing, photograph, microfilm or electronic media, including but not limited to any computer-readable memory and any computer software necessary to process such memory.

A copy of the form of HB Farm Consent Judgment is attached hereto as *Schedule V and the UCC-1 Financing Statement is attached hereto as Schedule VI.*

2.15    Upon execution of this Agreement, HB Farm will endeavor, in good faith to market and sell its Aqua Pacer Treadmill (the "**Aqua Pacer**") for the highest and best price through and including July 31, 2020.  In the event that a contract for sale has not been executed by July 31, 2020 for the Aqua Pacer, HB Farm will engage Auction Advisors, Oren Klein, to conduct an auction of the Aqua Pacer in place, or in the Auctioneer's professional discretion at another location, within thirty (30) days thereafter, with all net proceeds of the auction to be paid to BofA toward the Deficiency Balance.  Any amounts recovered from the sale or auction of the Aqua Pacer shall NOT be applied to the HB Farm Capped Deficiency Balance.

2.16    HB Farm shall be afforded six (6) months from the date hereof to satisfy the HB Farm Capped Deficiency Balance, either through liquidation of HB Farm other assets or through cash payments.  In the event that the HB Farm Capped Deficiency Balance has not been paid in full within six (6) months of the date hereof, BofA may record the HB Farm Consent Judgment in the State Court Action after providing notice and subject to the cure period provided for in the Stipulation of Settlement, subject only to credits for payments made.

2.17    Upon execution of this agreement, HB Farm's liability to BofA shall be limited to the amount of the HB Farm Capped Deficiency Balance, regardless of whether the Sale Transaction closes or there are any defaults hereunder, and HB Farm shall have no other obligations to BofA other than to satisfy the HB Farm Capped Deficiency Balance and to make good faith efforts to complete the sale of the Aqua Pacer, and to cooperate with the auctioneer to complete the sale of the Aqua Pacer.  Upon receipt of the proceeds from the sale of the Aqua Pacer and the payment of the HB Farm Capped Deficiency Balance in full, BofA shall execute specific releases in the form attached hereto as *Schedule VII*, and BofA shall authorize HB Farm to file a UCC-3 termination in favor of HB Farm and return the HB Farm Consent Judgment to HB Farm's counsel as provided for in the Stipulation of Settlement.

2.18    Intentionally omitted.

2.19    Upon execution hereof, BofA, and HB Farm shall execute a certain Stipulation of Settlement in the State Court Action, referencing and incorporating this Agreement and shall cause the Stipulation of Settlement to be filed with the Superior Court of New Jersey, Hunterdon Vicinage after dismissal of the Bankruptcy Action.  A copy of the Stipulation of Settlement is attached hereto as *Schedule VIII*.

### HB Land Pursuit of Its Purported Claims Against CATICO

2.20    ORMH as counsel to HB Land shall pursue HB Land's affirmative claims against Catico (the "**Catico Action**") for title insurance coverage as currently pled in the State Court Action, but subject to further amendment as necessary. HB Land and ORMH shall enter into a form of engagement agreement whereby ORMH shall agree to prosecute HB Land's claims against Catico on a contingency fee basis only, whereby HB Land is responsible for all costs and expenses and shall remunerate ORMH with 1/3 of any recovery from Catico, but the retainer agreement/contingency fee is subject to review and approval of BofA.

2.21    At the conclusion of the Catico Action by way of adjudication, or if HB Land and Catico reach a settlement, the net proceeds, if any, from any such recovery against Catico (the "**Insurance Proceeds**"), after payment of costs and expenses of the Catico Action and ORMH's one-third contingency fee (which shall be earned on the amount of recovery after expenses have been paid), shall be paid one-half to BofA toward any remaining Deficiency Balance and one-half to ORMH for any outstanding legal fees incurred by ORMH on behalf of HB Land.

2.22    Upon conclusion of the Catico Action and payment of any Insurance Proceeds by HB Land to BofA pursuant to this Agreement, BofA shall execute releases in favor of HB Land in the form attached hereto as *Schedule IX*.

2.23    Prior to and at all times following the date of this Agreement, each Obligor agrees to execute and deliver, or to cause to be executed and delivered, such documents and to do, or cause to be done, such other acts and things as might reasonably be requested by BofA to assure that the benefits of this Agreement are realized by the parties.

**BofA's Release of Guarantors**

2.24    BofA, hereby agrees to release Guarantors of any and all claims as follows:

BofA hereby releases and forever discharges Guarantors, jointly and severally from any and all claims, counterclaims, demands, damages, debts, agreements, covenants, suits, contracts, obligations, liabilities, accounts, offsets, rights, actions, and causes of action of any nature whatsoever, whether arising at law or in equity, whether presently possessed or possessed in the future, whether known or unknown, whether liability be direct or indirect, liquidated or unliquidated, whether presently accrued or to accrue hereafter, whether absolute or contingent, foreseen or unforeseen, and whether or not heretofore asserted, which BofA may have or claim to have against Guarantors, related to the 2010 Loan and/or Loan Modification.

3.       CONDITIONS.  BofA's obligations hereunder shall be subject to the satisfaction on or before March 27, 2020, unless an alternate date is specified, of the following conditions precedent:

3.1.     This Agreement shall have been executed by Obligors and BofA.

3.2.     All actions required to be taken by Obligors in connection with the transactions contemplated by this Agreement shall have been taken in form and substance satisfactory to BofA;

3.3.     BofA shall have received counterpart originals of this Agreement executed by all parties listed on the signature page(s) hereto and originals or certified or other copies of such other documents as BofA may reasonably request;

3.4.     Obligors shall be in compliance with all other terms of the 2010 Loan Documents other than as specifically provided herein.

4.      TERMINATION OF FORBEARANCE PERIOD.  The Forbearance Period shall end on the date of the first of the following to occur (the "**Forbearance Termination Date**"):

4.1.      October 31, 2020;

4.2.      A petition is filed by any HB Farm and/or HB Land under Title 11 of the United States Code (the "**Bankruptcy Code**"); or HB Farm and/or HB Land makes any assignment for the benefit of creditors; or HB Farm and/or HB Land voluntarily or involuntarily becomes the subject of any other case or proceeding for the relief or protection of debtors under any other law or statute or under any provision of common law, except for the pending Bankruptcy Action, which shall be dismissed with prejudice after Court approval of the Sale Motion;

4.3.      Any default, occurs or is determined to have occurred under any Loan Documents, including this Agreement hereinafter;

4.4.      Obligors initiate any judicial, administrative or arbitration proceeding against BofA;

5.      REPRESENTATIONS AND WARRANTIES. Obligors represent and warrant to BofA that:

5.1.      Recitals.  The recitals set forth above are true, complete, accurate, and correct and are part of this Agreement, and such recitals are incorporated herein by this reference;

5.2.      Loan Documents.  Except to the extent previously disclosed to BofA in writing, all representations and warranties made and given by Obligors in the 2010 Loan Documents are true, complete, accurate, and correct, as if given on the effective date of this Agreement;

5.3.      No Claims or Defenses. Obligors have no claims, offsets, counterclaims, or defenses with respect to:  i) the payment of the Loan; ii) the payment of any other sums due under the 2010 Loan Documents; iii) the performance of Obligors' obligations under the 2010 Loan Documents; or iv) any liability of Obligors under any of the 2010 Loan Documents;

5.4      No Breach by BofA.  BofA (including all of its predecessors): i) has not breached any duty to Obligors in connection with the 2010 Loan Documents; and ii) has fully performed all obligations it may have had or now has to Obligors;

5.5.      Interest and Other Charges.  All interest or other fees or charges which have been imposed, accrued or collected by BofA under the 2010 Loan Documents or in connection with the 2010 Loan through the date of this Agreement, and the method of computing the same, were and are proper and agreed to by Obligors, and were properly computed and collected

5.6. No Novation. This Agreement is not intended by the parties to be a novation of the 2010 Loan Documents and, except as expressly modified herein, all terms, conditions, rights, and obligations as set out in the 2010 Loan Documents are hereby reaffirmed and shall otherwise remain in full force and effect as originally written and agreed;

5.7. No Pending Bankruptcies. No action or proceeding, including, without limitation, a voluntary or involuntary petition for bankruptcy under any chapter of the Bankruptcy Code, has been instituted by or against Obligors, except as provided for herein;

5.8. Due Authorization. The individuals signing this Agreement on behalf of Obligors are duly authorized by Obligors to enter into this Agreement.

6. CONFIRMATION OF COLLATERAL/FURTHER ASSURANCES. Obligors hereby: i) confirm to BofA all security interests and liens heretofore granted to BofA securing the obligations of Obligors to BofA arising out of the 2010 Loan Documents; ii) acknowledge and agree that all such obligations shall continue to be secured by any and all such security interests and liens except as expressly provided herein; and iii) agree to execute and deliver to BofA any and all agreements and other documentation and to take any and all actions reasonably requested by BofA at any time to assure the perfection, protection, priority, and enforcement of BofA's rights under the 2010 Loan Documents, including this Agreement, with respect to all such security interests and liens, at Obligors' sole cost and expense.

7. BINDING EFFECT. This Agreement shall be binding upon Obligors, BofA, and their respective successors and assigns, and shall inure to the benefit of Obligors, BofA, and their respective successors and assigns; provided, however, that Obligors may not assign any rights arising from this Agreement or any 2010 Loan Documents without BofA's prior written consent, and any prohibited assignment shall be null and void.

8. COUNTERPARTS; EFFECTIVENESS. This Agreement may be executed in any number of counterparts and by the different parties on separate counterparts. Each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute one and the same agreement. This Agreement shall be deemed to have been executed and delivered on the Effective Date.

9. AMENDMENT AND WAIVER. No amendment or waiver of any provision of this Agreement shall be effective unless set forth in a writing signed by the parties hereto.

10. GOVERNING LAW. This Agreement shall be governed by and construed in accordance with the internal laws of the state provided for in the 2010 Loan Documents without reference to conflict of law principles.

11. SEVERABILITY. Any provision of this Agreement that is held to be inoperative, unenforceable, voidable, or invalid in any jurisdiction shall, as to that jurisdiction, be ineffective, unenforceable, void, or invalid without affecting the remaining provisions in that or any other jurisdiction, and to this end the provisions of this Agreement are declared to be severable.

12.     RELEASE.   As a material part of the consideration for BofA entering into this Agreement, HB Land, HB Farm and M.Merbler and E.Merbler (collectively "**Releasor**") agree as follows (the "**Release Provision**"):

12.1.     Releasor hereby releases and forever discharges BofA and BofA's predecessors, successors, assigns, officers, managers, directors, shareholders, employees, agents, attorneys, representatives, parent corporations, subsidiaries, and affiliates (hereinafter all of the above collectively referred to as "**BofA Group**") jointly and severally from any and all claims, counterclaims, demands, damages, debts, agreements, covenants, suits, contracts, obligations, liabilities, accounts, offsets, rights, actions, and causes of action of any nature whatsoever, including, without limitation, all claims, demands, and causes of action for contribution and indemnity, whether arising at law or in equity, or arising through the United States Bankruptcy Code, whether known or unknown, whether liability be direct or indirect, liquidated or unliquidated, whether absolute or contingent, foreseen or unforeseen, and whether or not heretofore asserted, which Releasor may have or claim to have against any of BofA Group from the beginning of the world until the date of this release.

12.2.     Obligors acknowledge that they are not currently aware of any claims that they have or may have against BofA Group that they have not already asserted in the State Court Action, the Bankruptcy Action and/or the Adversary Proceedings.

12.3.     Releasor agrees not to sue the BofA Group or in any way assist any other person or entity in suing BofA Group with respect to any claim released herein. The Release Provision may be pleaded as a full and complete defense to, and may be used as the basis for an injunction against, any action, suit, or other proceeding which may be instituted, prosecuted, or attempted in breach of the release contained herein;

13.     Releasor acknowledges, warrants, and represents to BofA Group that:

13.3.1.     Releasor has read and understands the effect of the Release Provision. Releasor has had the assistance of independent counsel of its own choice, or has had the opportunity to retain such independent counsel, in reviewing, discussing, and considering all the terms of the Release Provision; and if counsel was retained, counsel for Releasor has read and considered the Release Provision.  Before execution of this Agreement, Releasor has had adequate opportunity to make whatever investigation or inquiry it may deem necessary or desirable in connection with the subject matter of the Release Provision.

13.3.2.     Releasor is not acting in reliance on any representation, understanding, or agreement not expressly set forth herein. Releasor acknowledges that BofA Group has not made any representation with respect to the Release Provision except as expressly set forth herein.

13.3.3.     Releasor has executed this Agreement and the Release Provision thereof as its free and voluntary act, without any duress, coercion, or undue influence exerted by or on behalf of any person.

13.3.4.    Releasor is the sole owner of the claims released by the Release Provision, and Releasor has not heretofore conveyed or assigned any interest in any such claims to any other person or entity.

13.4.    Releasor understands that the Release Provision was a material consideration in the agreement of BofA to enter into this Agreement.

13.5.    It is the express intent of Releasor that the release and discharge set forth in the Release Provision be construed as broadly as possible in favor of BofA Group so as to foreclose forever the assertion by Releasor of any claims released hereby against BofA Group.

13.6.    If any term, provision, covenant, or condition of the Release Provision is held by a court of competent jurisdiction to be invalid, illegal, or unenforceable, the remainder of the provisions shall remain in full force and effect.

14.    DEFAULT.  If the Obligors fail comply with any of the obligations set forth in this Agreement, then BofA shall be immediately entitled to pursue its rights and remedies as set forth in the 2010 Loan Documents and this Agreement, without further notice to Obligors.

15.    NOTICES.  Any notice or other communication to be given pursuant to this Agreement shall be deemed to have been properly given if in writing and if sent by e-mail and Federal Express, to the following addresses:

If to Bank of America:

> Bank of America, N.A.
> Attn: Nicholas Cardarelli
> Bank of America; Special Assets Group
> 1 Financial Plaza
> Providence, RI 02903
> RI1-537-09-03
> nicholas.cardarelli@bofa.com

With a copy to:

David B. Grantz, Esq.
Meyner and Landis LLP
One Gateway Center, Suite 2500
Newark, New Jersey 07102
dgrantz@Meyner.com

If to the Obligors:

High Brass Farm, L.L.C.
68 Sky Manor Road
Pittstown, New Jersey 08887

Attn.: Michael Merbler
and Elizabeth Perry-Merbler

High Brass Farm Land Holdings, LLC
68 Sky Manor Road
Pittstown, New Jersey 08887
Attn.: Michael Merbler
and Elizabeth Perry-Merbler

Michael Merbler
68 Sky Manor Road
Pittstown, New Jersey 08887

Elizabeth Perry-Merbler
68 Sky Manor Road
Pittstown, New Jersey 08887

With a copy to:

Courtney A. Schael, Esq.
ASHFORD - SCHAEL LLC
100 Quimby Street, Suite 1
Westfield, NJ  07090
cschael@ashfordnjlaw.com

Edmond George, Esq.
Obermayer Rebmann Maxwell & Hippel LLP
Centre Square West
1500 Market Street | Suite 3400
Philadelphia, PA 19102-2101
Edmond.George@obermayer.com

16. **FINAL AGREEMENT. THIS WRITTEN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES HERETO**, and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements between the parties.  There are no unwritten oral agreements between the parties.

17. <u>Trial by Jury</u>.  EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THE LOAN OR LENDER/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS.

EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT

OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 17</u>.

EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

18.     EXECUTION IN COUNTERPARTS**.**  This Agreement may be executed in counterparts, each of which when taken together shall constitute one and the same original; facsimile and PDF signatures shall be deemed as originals.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed and delivered as of the day and year first above written.

**SIGNATURE PAGE TO FOLLOW**

BANK OF AMERICA, N.A.

Date: May __, 2020          By: _____
                                Nicholas Cardarelli
                                Officer, Financial Analyst


HIGH BRASS FARM, L.L.C.

Date: May __, 2020          By: _____
                                Michael Merbler
                                Managing Member


HIGH BRASS FARM LAND HOLDINGS, LLC

Date: May 4, 2020           By: _____
                                Michael Merbler
                                Managing Member


Date: May __, 2020          By: _____
                                Michael Merbler


Date: May __, 2020          By: _____
                                Elizabeth Perry-Merbler


19

STATE OF RHODE ISLAND       )

                                     ) SS.:

COUNTY OF _____     )

        On this 5th day of May 2020, before me, Nicholas Cardarelli, personally appeared on behalf of BANK OF AMERICA, N.A., and known by me to be an authorized representative of said BANK OF AMERICA, N.A. the party executing the foregoing Instrument, and he acknowledged said Instrument to be his free act and deed and the free act and deed of said BANK OF AMERICA, N.A.


_____

Notary Public
My Commission Expires:_____
Seal:

STATE OF NEW JERSEY )
                           ) SS.:
COUNTY OF _____ )

        On this 5th day of May 2020, before me, Michael Merbler, personally appeared on behalf of HIGH BRASS FARM, L.L.C., and known by me to be an authorized representative of said HIGH BRASS FARM, L.L.C., the party executing the foregoing Instrument, and he acknowledged said Instrument to be his free act and deed and the free act and deed of said HIGH BRASS FARM, L.L.C.


_____
Notary Public
My Commission Expires:_____
Seal:


STATE OF NEW JERSEY )
                            ) SS.:
COUNTY OF _____ )

        On this 5th day of May 2020, before me, Michael Merbler, personally appeared on behalf of HIGH BRASS FARM LAND HOLDINGS, LLC, and known by me to be an authorized representative of said HIGH BRASS FARM LAND HOLDINGS, LLC, the party executing the foregoing Instrument, and he acknowledged said Instrument to be his free act and deed and the free act and deed of said HIGH BRASS FARM LAND HOLDINGS, LLC.


_____
Notary Public
My Commission Expires:_____
Seal:

STATE OF NEW JERSEY   )
          ) SS.:
COUNTY OF _____ )


On the 5th day of May in the year 2020, before me, the undersigned, Michael Merbler personally appeared, and is personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument acknowledged to me that he executed the same individually by his signature on the instrument.

Signed and sworn to before me on May 5, 2020


_____
Notary Public

STATE OF NEW JERSEY   )
          ) SS.:
COUNTY OF _____ )


On the 5th day of May in the year 2020, before me, the undersigned, Elizabeth Perry-Merbler personally appeared and is personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument acknowledged to me that she executed the same individually by her signature on the instrument.

Signed and sworn to before me on May 5, 2020


_____
Notary Public

## SCHEDULE I

## Easement and Maintenance Agreement

## SETTLEMENT AGREEMENT

This Settlement Agreement is entered into this ____ day January of 2020, by and between High Brass Farm Land Holdings LLC, a New Jersey Limited Liability Company, with its principal address at 68 Sky Manor Road, Pittstown, New Jersey ("High Brass"), and Sky Manor Airport Partners, LLC, a New Jersey Limited Liability Company, with a principal address at 48 Sky Manor Road, Pittstown, New Jersey ("Sky Manor" with High Brass the "Parties" and each a "Party"), and each intending to be mutually bound by the promises and covenants contained herein do hereby enter into this Settlement Agreement, and agree as follows:

**WHEREAS**, High Brass, a New Jersey limited liability company, acquired Lot 21, Block 38, 35.19 acres of commercial and residential real property in 2005 which is utilized by an affiliate as a full-service equine boarding, training and show facility consisting of several barns containing forty (40) stalls, indoor and outdoor training and equine rehabilitation facility, fenced paddocks, and residential rental properties (the "Farm"); and

**WHEREAS**, Sky Manor, a New Jersey limited liability company, owns and operates commercial real property known as Lots 38.02 and 40 in Block 21, in 2008, which property is utilized as a private aviation facility, known as Sky Manor Airport, with a 2,900-foot paved runway equipped for day and night operation (the "Airport"); and

**WHEREAS**, the Farm and the Airport are adjacent parcels once owned by a common owner; and

**WHEREAS**, prior to 2002, the Farm and the Airport were owned as a single 94-acre tract of land which is now subdivided pursuant to final approval granted by the Alexandria Township Planning Board ("Planning Board") in a Resolution dated January 20, 2005; and

1

217858043

OMC\4821-1730-3218.v1-1/17/20

**WHEREAS**, a subdivision plat was recorded as map #8547128 on June 15, 2005, with an amended plat recorded as instrument #8591746 on July 5, 2006, which subdivision ("Subdivision") divided the property into 19 distinct lots (the "Subdivision") which became the Airport, the Farm, and a 17 Lot residential development that serves as a residential community ("Airpark"); and

**WHEREAS**, as a result of a site plan approval granted on April 10, 2006, the Airport was permitted to extend its runway into Lot 38.02, over what was at that time the Farm's driveway, and the Subdivision approved the removal of the Farm's original driveway and also approved access to the Farm to/from Sky Manor Road via a driveway through the Airport's property (the "New Driveway") as well as emergency access via Amelia Way); and

**WHEREAS,** an access easement allowing High Brass to use the New Driveway has not previously been recorded; and

**WHEREAS**, around 2015 a dispute arose between Sky Manor and High Brass concerning the rights to use the New Driveway, which is the only means of ingress and egress other than the emergency access, to and from the Farm via Sky Manor Road; and

**WHEREAS**, without access to Sky Manor Road via the New Driveway, the Farm was completely landlocked except for the emergency access; and

**WHEREAS**, on August 6, 2019 (the "Petition Date"), High Brass filed a voluntary petition under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the "Bankruptcy Code") in the U.S. Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court").  High Brass's bankruptcy case is captioned as: *In re High Brass Farm Land Holdings LLC*, D.N.J., Case No. 19-25217(MBK) (the "Bankruptcy Case"); and

2

**WHEREAS**, prior to the Petition Date, on or about December 13, 2018, High Brass, along with its two (2) members, Michael and Elizabeth Merbler, and High Brass Farm, LLC commenced a civil action in the Hunterdon County Superior Court against Sky Manor Airport Partners, LLC, New Jersey Title Insurance Company n/d/b/a CATIC, and Fidelity National Title Insurance,[1] Case No: HNT-L-000477-18 (the "State Litigation"); and

**WHEREAS**, on August 14, 2019, the Litigation was removed to the Bankruptcy Court seven (7) days after the Petition Date captioned *High Brass Farm Land Holdings LLC et al. v. Sky Manor Airport Partners, LLC et al*., and assigned adversary number 19-02093(MBK) ("Adversary Proceeding", collectively with the State Litigation, the "Litigation"); and

**WHEREAS**, certain Parties agreed to mediation with Anthony Sodono, Esq. serving as the mediator (the "Mediation"); and

**WHEREAS**, the Parties having engaged in the Mediation of their disputes and have reached a resolution of the issues related to the New Driveway and ingress and egress to the Farm; and

**WHEREAS**, the Parties have determined that resolution of the instant matter short of litigation, best serves the interests of all parties involved.

NOW THEREFORE, AND THE PARTIES INTENDING TO BE MUTUALLY BOUND BY THE PROMISES AND COVENANTS CONTAINED HEREIN, DO HEREBY STIPULATE AND AGREE AS FOLLOWS:

---

[1] Fidelity National Title Insurance filed a motion to dismiss which was granted on April 30, 2019 and is no longer a Party to the action indexed at HNT-L-000477.

3

217858043

OMC\4821-1730-3218.v1-1/17/20

1.      Sky Manor acknowledges the easement for the New Driveway in its present location, and the Parties will execute and file a recorded access easement ("Driveway Access Easement and Maintenance agreement") in the form attached hereto as Exhibit A, with the Driveway Access Easement Area described by reference to the marked-up survey excerpt, attached as a part of Exhibit "A".   The Exhibit "A", Driveway Access Easement and Maintenance agreement shall be fully executed within 15 days of Court Approval of this Settlement Agreement by final order, and recorded by Sky Manor as soon as possible thereafter.

2.      The Driveway Access Easement and Maintenance agreement attached as Exhibit "A" limits uses by High Brass to traffic resulting from current or other permitted uses of the Farm. Exhibit "A" also prohibits parking by Sky Manor on or along the gravel portion of the Driveway Access Easement area, except that Sky Manor may have reasonable access to the gravel portion as necessary for maintenance and repair of the existing septic system and propane tank located in that area of the Airport.  Exhibit "A" also provides that if in the process of accessing the gravel portion of the easement, Sky Manor damages the surface, it shall immediately repair same at its sole cost and expense.

3.      Starting at the recording date Exhibit "A" and continuing without interruption *ad infinitum* into the future, both Parties shall carry insurance and shall list each other as additional insureds. Also starting at the recording of Exhibit "A", and continuing without interruption *ad infinitum* into the future, High Brass shall indemnify and hold Sky Manor harmless for all damages arising on the gravel portion of the easement, not covered by insurance and Sky Manor will indemnify and hold High Brass harmless for any damages occurring on the paved portion of the easement not covered by insurance.

4

4.      Starting at the recording date of Exhibit "A", and continuing without interruption *ad infinitum* into the future, High Brass shall maintain the gravel portion of the Access Easement at its sole cost.

5.      Starting at the recording date of the Exhibit "A" Access Easement, and continuing without interruption *ad infinitum* into the future. Sky Manor shall maintain the paved portion of the Access Easement at its sole cost, and maintenance shall include snow-plowing, repairs and repaving in accordance with the following:

a.      High Brass shall deposit One Thousand Dollars ($1,000.00) per quarter into a designated paving escrow account beginning 15 days after recording of the Exhibit "A" Access Easement, *ad infinitum,* for contribution by High Brass towards repaving of the paved portion of the Access Easement, and such funds shall not be used for minor repairs or snow-plowing. The amount of the deposit shall be increased on an annual basis in accordance with the BLS consumer price index for the northeast region of the United States.

b.      At such time as Sky Manor deems repaving to be necessary to allow convenient use by its tenants, customers and members, but no more frequently than every eight (8) years, the paved portion of the access easement may be repaved, in which case funds in the paving escrow account may be utilized by Sky Manor for repaving. Sky Manor shall be the contracting party for any repaving, which shall be done in a workmanlike manor. Sky Manor can in its discretion pave more frequently at its own expense, and without the use of the funds set forth in ¶ a hereof.

5

c. In the event that High Brass fails to make any quarterly payment within thirty (30) days of the due date, Sky Manor may, after providing certified mail notice to High Brass, pursue enforcement of the Settlement Agreement by summary proceeding in the Law Division, Hunterdon County but shall not attempt to block access or otherwise impair High Brass's interests in the Access Easement.

6. In consideration of the terms herein, and for other good and valuable consideration, High Brass, on one hand, and Sky Manor, on the other hand, do hereby mutually release and discharge each other, and their respective heirs, representatives, agents, employees, attorneys, successors, assigns and affiliates, from any and all claims of any nature whatsoever, which High Brass and Sky Manor, or their successors, assigns and affiliates now or hereafter can or may have against each other, from the beginning of the world to the date of these presents, including, but not limited to, any claims arising out of or in connection with the access between High Brass and Sky Manor dispute, not otherwise specifically preserved in this Settlement Agreement ("Mutual Releases"). The Mutual Releases contained herein shall be effective upon a final Order of the Bankruptcy Court approving this Settlement Agreement.

7. The Mutual Releases provided for herein shall not apply to any third-party or non-signatory on this Settlement Agreement.

8. The Parties agree that Sky Manor may record, at its sole cost after execution by High Brass, the release/extinguishment of easement(s) recorded at Deed Book 91, page 243 and Deed Book 771, page 936, for the old driveway which runs through the Airport runway extension, said release/extinguishment to be in form attached as Exhibit "B".

6

9.      High Brass shall within 10 days of full execution of the Settlement Agreement, file

a Motion to Approve the Settlement Agreement Pursuant to Federal Bankruptcy Rule 9019.

10.      Sky Manor's Pre-Petition damage claim shall be allowed as an Unsecured Claim in

the amount of Two Thousand Dollar ($2,000.00), which will receive no distribution until other

General Unsecured Claims are paid under the Plan.

11.      High Brass will file a Plan that is consistent with the Term Sheet and this Settlement

Agreement.  Sky Manor will support any Plan filed pursuant to this paragraph.

12.      Upon entry of a final Order of the Bankruptcy Court approving the Settlement

Agreement, High Brass shall dismiss Sky Manor as a party in the Litigation.

13.      Notwithstanding anything to the contrary herein, this Settlement Agreement is

subject to written agreement by Bank of America, N. A. to the following: (i) the form and content

of Exhibits "A" and "B", (ii) the recording of Exhibits "A" and "B"; and (iii) that Exhibits "A"

and "B" shall be binding upon and have priority over Bank of America, N. A.'s mortgage and

other interests in the Farm and/or Airport.

14.      Neither this Settlement Agreement nor any other documents executed or delivered

in connection herewith shall constitute or be considered any admission or acknowledgement of

liability on the part of any Party hereto, nor be deemed to be evidence thereof.

15.      This Settlement Agreement is intended by the Parties as a final expression of their

settlement, and is intended as a complete and exclusive statement of the terms and conditions

thereof.  Acceptance of or acquiescence in a course of performance rendered under this Agreement

shall not be relevant to determine the meaning of this Settlement Agreement even though the

7

217858043

OMC\4821-1730-3218.v1-1/17/20

accepting or acquiescing party had knowledge of the nature of the performance and opportunity for objection.

16.    This Settlement Agreement contains the entire agreement between the Parties hereto and this Settlement Agreement may not be amended, modified or waived except by a writing executed by the Parties.

17.    If any provision of this Settlement Agreement should be found to be invalid or unenforceable, all of the other provisions shall nonetheless remain in full force and effect to the maximum extent permitted by law.

18.    The Parties to this Settlement Agreement covenant and agree that they will execute such other instruments and documents that are and may become necessary to effect and carry out this Settlement Agreement.

19.    Each of the Parties shall pay its own respective costs and attorneys' fees incurred with respect to the matters underlying this Settlement Agreement, unless otherwise specifically indicated herein.

20.    This Settlement Agreement shall be construed without regard to any presumption or other rule requiring construction against the Party causing the document to be drafted.  Each Party warrants that it has been represented and fully advised by counsel or has had full opportunity to be represented and advised by counsel with respect to this Settlement Agreement and all matters covered by it.

21.    This Settlement Agreement shall be binding upon and inure to the benefit of the successors and assigns of the Parties hereto including any subsequently appointed trustee or other fiduciary, and may be executed via facsimile or in multiple original counterparts, each of which

8

shall be deemed an original, and all such counterparts shall together constitute but one and the same instrument.

22.    This Settlement Agreement shall be interpreted in accordance with the law of the State of New Jersey and applicable provisions of Title 11 of the United States Code.

23.    Any dispute arising out of this Settlement Agreement shall be resolved by the Bankruptcy Court with the Parties desire to retain jurisdiction of the Bankruptcy Court.

**THE PARTIES HERETO, AND EACH INTENDING TO BE MUTUALLY BOUND HAVE EXECUTED THIS SETTLEMENT AGREEMENT ON THE DATE SET FORTH BELOW.**

HIGH BRASS FARM LAND HOLDINGS LLC

Dated: _____        _____

SKY MANOR AIRPORT PARTNERS LLC

Dated: _____        By: _____
Name:
Title:

9

217858043

OMC\4821-1730-3218.v1-1/17/20

# EXHIBIT A

**EXHIBIT "A"TO SETTLEMENT AGREEMENT**

## DRIVEWAY ACCESS EASEMENT AND MAINTENANCE AGREEMENT

This Driveway Access Easement and Maintenance Agreement is made and entered into as of January ___, 2020, by and between Sky Manor Airport Partners, LLC, a New Jersey limited liability company with a principal address at 48 Sky Manor Road, Pittstown, New Jersey ("Sky Manor" or "Grantor") and High Brass Farm Land Holdings, LLC, a New Jersey limited liability company with its principal address at 68 Sky Manor Road, Pittstown, New Jersey ("High Brass" or "Grantee").

WHEREAS, Grantor is the owner of real property located in Alexandria Township and known as Lots 38.02 and 40 in Block 21; and

WHEREAS, Grantee is the owner of real property located in Alexandria Township known as Lot 38, Block 21; and

WHEREAS, the property owned by Grantor is located adjacent to the property owned by Grantee; and

WHEREAS, The parties have entered into a Settlement Agreement providing, among other things, for the execution and recording of a Driveway Access Easement and Maintenance Agreement after Court approval of the Settlement Agreement; and

WHEREAS, this Driveway Access Easement and Maintenance Agreement sets forth the terms and conditions under which Grantee shall have access through the Driveway Access Easement Area as shown on the attached Exhibit A hereto, which Exhibit A shows both the gravel portion and the paved portion of the Driveway Access Easement Area.

NOW, THEREFORE, Grantor for and in consideration of the sum of Ten and 00/100 Dollars ($10.00) lawful money of the United States of America and other good and valuable consideration, to it in hand paid by Grantee and in consideration of the agreements and covenants herein undertaken by Grantee, hereby covenants to Grantee a driveway access easement in the nature described below and pursuant to the terms and conditions described below:

1.     Grantor hereby grants to Grantee, a perpetual, non-exclusive easement on, over, through and across Grantor's property, in the location described in the attached Exhibit A.

2.     Grantee's use of the access easement shall be limited to vehicular and pedestrian traffic resulting from current or other permitted uses of Grantee's property, Lot 38, Block 21.

3.     Parking by Grantor is prohibited on or along the gravel portion of the Driveway Access Easement Area, except that Grantor may have reasonable access to the gravel portion as necessary for maintenance and repair of the existing septic system and propane tank located in that area of Grantor's property.  If in the process of accessing the gravel portion of the Driveway Access Easement Area, Grantor damages the surface, it shall immediately repair same at its sole cost and expense.

4.    Grantee shall indemnify and hold Grantor harmless for any damages occurring on the gravel portion of the Driveway Access Easement Area, which damages are not covered by insurance and Grantor shall indemnify and hold Grantee harmless for any damages occurring on the paved portion of the Driveway Access Easement Area, which damages are not covered by insurance.

5.    Grantee shall obtain and maintain insurance coverage, including commercial general liability insurance covering bodily injury and property damage liability, contractual liability, personal and advertising injury liability, completed operations and products liability, with the limit of liability as such insurance not being less than $1,000,000.00 per occurrence. Grantee shall also obtain and maintain automobile bodily injury and property damage liability insurance for owned, non-owned and hired automobiles used in the performance of this Agreement with a limit of liability of such insurance to be not less than $1,000,000.00 combined single limit for bodily injury and property damage. Grantee shall provide Grantor, annually, with certificates or other documentary evidence of the above-required insurance. The maintenance of the above-described insurance shall not relieve Grantee of its indemnity obligations as set forth herein.

6.    Grantor shall obtain and maintain insurance coverage, including commercial general liability insurance covering bodily injury and property damage liability, contractual liability, personal and advertising injury liability, completed operations and products liability, with the limit of liability as such insurance not being less than $1,000,000.00 per occurrence. Grantor shall also obtain and maintain automobile bodily injury and property damage liability insurance for owned, non-owned and hired automobiles used in the performance of this Agreement with a limit of liability of such insurance to be not less than $1,000,000.00 combined single limit for bodily injury and property damage. Grantor shall provide Grantee, annually, with certificates or other documentary evidence of the above-required insurance. The maintenance of the above-described insurance shall not relieve Grantor of its indemnity obligations as set forth herein.

7.    Grantee shall maintain the gravel portion of the Driveway Access Easement Area, said maintenance to be at Grantee's sole cost and expense.

8.    Grantor shall maintain the paved portion of the Driveway Access Easement Area, said maintenance to be at the sole expense of Grantor, and to include snow plowing, repairs and repaving in accordance with the following:

a.    Grantee shall deposit $1,000.00 per quarter, ad infinitum, into a designated paving escrow account. The purpose of this escrow account is for contribution by Grantee towards repaving of the paved portion of the Driveway Access Easement Area, and such funds shall not be used for minor repairs or snow plowing. The amount of the deposit shall be increased on an annual basis in accordance with the BLS consumer price index for the northeast region of the United States.

b.    At such time as Grantor deems repaving to be necessary to allow convenient use by its tenants, customers and members, but no more frequently than every eight years, the paved portion of the Driveway Access Easement Area may be repaved, in which case

2

funds in the paving escrow account may be utilized by Grantor for repaving. Grantor shall be the contracting party for any repaving, which shall be done in a workmanlike manor. Grantor can in its discretion pave more frequently at its own expense, and without the use of the funds set forth in ¶ a. hereof.

     c.     In the event that Grantee fails to make any quarterly payment within 30 days of the due date, Grantor may, after providing certified mail notice to Grantee, pursue enforcement by summary proceeding in the Law Division, Hunterdon County but Grantor shall not attempt to block access or otherwise impair Grantee's interests in the Driveway Access Easement Area.

9.     Nothing contained herein shall be deemed to constitute a gift, grant, or dedication of the Driveway Access Easement Area to the general public or for any public purpose whatsoever, it being the intention of the Grantor and Grantee that this Easement will be strictly limited and applicable to Grantor and Grantee.

10.     Each of the obligations, rights, responsibilities, and easements created or imposed are appurtenant to Grantor and Grantee's properties and may not be transferred, assigned, or encumbered. Each covenant contained in this document: (i) is made for the direct, mutual, and reciprocal benefit of Grantor's property and Grantee's property; (ii) constitutes a covenant running with the properties; and (iii) will inure to the benefit of each and all of the parties and each party's successors, assigns, and mortgagees.

11.     No default or other breach will entitle any party to cancel, rescind or otherwise terminate this Driveway Access Easement and Maintenance Agreement.

12.     All notices and other communications required are permitted to be given pursuant to the terms and conditions of this Driveway Access Easement and Maintenance Agreement shall be in writing, and delivered personally or sent via Certified Mail, Return Receipt Requested or overnight carrier to the parties at the addresses set forth below to such other parties or addresses as each party may designate by written notice to the other:

TO GRANTOR:                          GRANTEE:

Richard Leone                           Michael K. Merbler
Sky Manor Airport Partners, LLC          High Brass Farm Land Holdings, LLC
Sky Manor Airport                       68 Sky Manor Road
48 Sky Manor Road                   Pittstown, NJ
Pittstown, NJ

3

13.    This Driveway Access Easement and Maintenance Agreement shall run with the land, and Grantor has the right to record this Agreement in the Office of the County Clerk of Hunterdon County.

Sky Manor Airport Partners, LLC

By: _____

Dated: _____

WITNESS:

High Brass Farm Land Holdings, LLC

By: _____
Michael K. Merbler
Managing Partner

Dated: _____

WITNESS:

217858369v1

4



# EXHIBIT B

Prepared By:   Guliet D. Hirsch, Esq.
               Archer & Greiner, PC
               101 Carnegie Center
               Suite 300, 3rd Floor
               Princeton, NJ 08540

## EXHIBIT "B" TO SETTLEMENT AGREEMENT

## EXTINGUISHMENT OF EASEMENTS

This Extinguishment of Easements made this ____ day of _____, 2020, by the High Brass Farm Land Holdings, LLC, a New Jersey limited liability company with a principal address at 68 Sky Manor Road, Pittstown, New Jersey ("High Brass"), and Sky Manor Airport Partners, LLC, a limited liability company of the State of New Jersey with a principal address at 48 Sky Manor Road, Pittstown, New Jersey (the "Grantee").

1.    High Brass is the holder and beneficiary of the following easements:

      A.    Access Easement, recorded in the Hunterdon County Clerk's Office at Deed Book 91 page 243; and.

      B.    Access Easement, recorded in the Hunterdon County Clerk's Office, at Deed Book 771, Page 936.

      (Collectively, the easements described above are referred to as the "Access Easements").

2.    High Brass has agreed to extinguish and release to Grantee any and all right, title and interest in and to the portion of the Access Easements.

NOW, THEREFORE, in consideration of other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, High Brass does hereby extinguish and release all right, title and interest that High Brass possesses to the Grantee.

IN WITNESS WHEREOF, High Brass has executed this Extinguishment of Easements the day and year first written above.

WITNESS:

_____

High Brass Farm Land Holdings, LLC

_____
Michael J. Merbler, Managing Member

STATE OF NEW JERSEY          :

COUNTY OF HUNTERTON              :

I CERTIFY that on this _____ day of _____, 2020, Michael J. Merbler, personally came before me and acknowledged under oath to my satisfaction that he:

(a)    is the Managing Member of High Brass Farm Land Holdings, LLC., and the Grantor named in this Extinguishment of Easements;

(b)    this Extinguishment of Easements was signed and delivered on behalf of High Brass Farm Land Holdings, LLC. as its voluntary act duly authorized; and

(c)    High Brass Farm Land Holdings, LLC made this Extinguishment of Easements for $1.00 as the full and actual consideration paid or to be paid for the extinguishment of title. (Such consideration is defined in N.J.S.A. 46:15-5.)

_____
Notary Public

217858713v2

# SCHEDULE II

## Agreement of Sale

**AGREEMENT OF SALE**

between

**EVS FAMILY BRASS FARM LLC**

as Buyer

AND

**HIGH BRASS FARM LAND HOLDINGS LLC**

as Seller

FOR

**68 SKY MANOR ROAD
PITTSTOWN, NEW JERSEY 08867**

Dated: April _____, 2020

4823-7045-2662

## AGREEMENT OF SALE

THIS IS AN AGREEMENT made as of the ___ day of April ___, 2020, by and between **EVS FAMILY BRASS FARM LLC** (hereinafter referred to as the "Buyer"), and **HIGH BRASS FARM LAND HOLDINGS LLC** (hereinafter referred to as the "Seller").

## BACKGROUND

A.  Seller is currently the Legal Owner of the Property, consisting of the Property located at 68 Sky Manor Road, Pittstown, New Jersey, 08867, all of which the Seller intends and hereby agrees to sell to Buyer by transferring title thereto to Buyer.

B.  Buyer intends and hereby agrees to purchase from Seller the Property, including without limitation, the Property all appurtenance, and such other interests and property as set forth herein, under the terms and conditions set forth in this Agreement.

C.  On August 6, 2019, Seller filed a petition for relief under Chapter 11 of the U.S. Bankruptcy Code in the United States District Court for the District of New Jersey ("Bankruptcy Court"), Case No. 19-25217-MBK (the "Bankruptcy Case") which Bankruptcy Case is presently pending.

## AGREEMENTS

In consideration of the mutual promises and agreements herein set forth and good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

1. **Definitions.**

    1.1    Closing.  The term "Closing" shall have the meaning set forth in Subsection 5.1 below.

    1.2    Closing Date.  The term "Closing Date" shall have the meaning set forth in Subsection 5.2 below.

    1.3    Deed.  The term "Deed" shall have the meaning set forth in Subsection 4.2 below.

    1.4    Indemnify.  The terms "Indemnify" and "Indemnification" shall mean an agreement (the party making such agreement being herein called the "Indemnifying Party") to indemnify, defend and save and hold harmless the party to whom the indemnity is directed and their respective partners, heirs, successors and assigns (such parties to whom the indemnity is directed being herein called the "Indemnified Party") from and against, and to reimburse the Indemnified Party with respect to, any and all claims, demands, causes of action, loss, damage, liabilities, costs and expenses (including attorneys' fees and expenses, court costs, and costs of

1

DocuSign Envelope ID: FB9D850D A656-40BF-AA2D-183A13C28D5A

appeals) asserted against or incurred by the Indemnified Party by reason of or arising out of the matter with respect to which the indemnity is given by the terms of this Agreement, provided that loss or damage shall be for direct loss and damages sustained and not consequential damages.

      1.5   <u>Property</u>.  The term "Property" shall mean, collectively, (i) all of the buildings situated on the real estate, consisting of three stables, an indoor arena, a shop and three houses including five separate residential units totaling 35,766 gross square feet, and all other improvements constructed or situate on the real estate, including, without in any manner limiting the generality of the foregoing, all fixtures, fittings, and all components thereof, such as any and all signs, elevators, partitions, ducts, motors, compressors, cabinets, antennas, and the heating, ventilating, air conditioning, plumbing, sprinkling, vacuum cleaning, drainage, lighting, gas, electrical, security, and communications systems now or hereafter located therein; (ii) the fee simple absolute interest in the real property consisting of the 36.6919 acre site, located at 68 Sky Manor Road, Pittstown, NJ [Lot 21, Block 38] together with all gores, strips, easements, tenements, hereditaments, rights, liberties, powers, or privileges, all chooses in action and claims relating to the land, all of Seller's right, title and interest in and to the bed of any streets, roads, and avenues open or proposed in front of or adjoining the land, and awards in condemnation; and (iii) the fee simple absolute interest in the real property located at 68 Sky Manor Road, Pittstown, NJ and all improvements and the buildings thereon, together with all gores, strips, easements, tenements, hereditaments, rights, liberties, powers, privileges, and appurtenances to the real estate or to the buildings or in any way pertaining to the real estate or the buildings or their use, all chooses in action and claims relating to the real estate or the buildings, all of Seller's right, title and interest in and to the bed of any streets, roads, and avenues open or proposed in front of or adjoining the real estate, and awards in condemnation; and (iv) all property and interests conveyed, sold, assigned, or otherwise transferred to Buyer under the terms of this Agreement.

      1.6   <u>Purchase Price</u>.  The term "Purchase Price" shall have the meaning set forth in Subsection 3.1 below.

      1.7   <u>Title Company</u>.  The term "Title Company" shall mean a reputable title insurance company of Buyer's choice doing business in the jurisdiction in which the Property is located.

      1.8   <u>Title Encumbrances</u>.  The term "Title Encumbrances" shall mean (i) all laws, regulations or ordinances of federal, state, county or local entities or agencies having jurisdiction over the Property, provided same do not prohibit the use and enjoyment of the Property for Buyer's intended use; and (ii) easements, covenants and restrictions of record, provided that same have not been violated, would not render title to the Property unmarketable nor would materially interfere with the Buyer's intended use of the property.

    **2.**  **Sale of the Property.**  Seller agrees to sell, assign, transfer, and convey to Buyer, and Buyer agrees to purchase from Seller, upon the terms and conditions herein set forth good, marketable, and insurable fee simple absolute title to the Property.

2

**3.  Purchase Price.**

3.1   <u>Amount of Purchase Price</u>.  The total purchase price to be paid by Buyer to Seller for the Property (the "Purchase Price") shall be the sum of One Million Three Hundred Thousand Dollars ($1,300,000.00).

3.2   <u>Payment of Purchase Price</u>.  The Purchase Price, subject to adjustment as herein provided, shall be paid by Buyer to Seller as follows:

(i)  One Hundred Thirty Thousand Dollars ($130,000.00) at signing hereof (the "Deposit") and the balance at the time of Closing.  The Deposit shall be held in escrow by counsel to the Seller in an interest bearing account.  All interest earned on the Deposit shall be credited to Buyer at Closing.

(ii)  The balance of the Purchase Price shall be paid at Closing in immediately available funds.

**4.  Closing Documents to Be Delivered by Seller.**  At Closing, Seller shall deliver to Buyer all of the following:

4.1   <u>Sale Order</u>. The Sale Order entered by the Bankruptcy Court in form and substance acceptable to the Buyer and Seller, shall include (i) a finding that the Transaction is in good faith and otherwise satisfies the provisions of Section 363, including Sections 363(m) and (n), of the Bankruptcy Code; (ii) authorization and approval of this Agreement and all transactions pursuant to this Agreement; (iii) a provision that the Property and Assets are being transferred pursuant to this Agreement free and clear of all liens, claims and encumbrances with all liens tracing to the proceeds of the sale; and (iv) free of transfer or other stamp tax, with all liens tracing to the proceeds of the sale. This Agreement and all transactions contained herein and all of Buyer's and Seller's obligations hereunder are contingent upon and subject to the entry of the Sale Order which shall be in full force and effect at the time of Closing and shall not have been stayed, enjoined or modified.

4.2   <u>Deed</u>.  A special warranty deed (the "Deed"), duly executed, acknowledged, and in recordable form, conveying good, marketable, and insurable title to the Property to Buyer, subject only to the Title Encumbrances.

4.3   <u>Assignment of Warranties and Guaranties</u>.  A general assignment assigning and transferring all warranties and guaranties benefiting Seller or obtained by Seller in connection with the construction, maintenance, or operation of the Property.

4.4   <u>Title Documents</u>.  Such documents as are required for the issuance of title insurance as set forth in Subsection 9.1 below.

4.5   <u>FIRPTA Certificate</u>.  A FIRPTA certificate in the form attached hereto as "Exhibit C" and made a part hereof.

4.6    <u>Miscellaneous</u>.  Such other documents as reasonably may be required to fulfill Seller's obligations hereunder and effectuate the sale contemplated hereby.

4.7    <u>Settlement Order</u>.   The order entered by the Bankruptcy Court approving the settlement among High Brass Farm Land Holdings LLC and Sky Manor Airport Partners, LLC.

4.8.    <u>Transfer tax</u>.  The sale contemplated by this Agreement is pursuant to Debtor's Plan.  Accordingly, the sale contemplated herein is free of, and not subjected to any realty transfer tax.  If the sale is not approved as part of the Debtor's Plan, then the Seller shall pay any applicable transfer tax.  The Buyer shall pay any applicable "mansion tax".

**5.    <u>Closing</u>.**

5.1    <u>Place of Closing</u>.  The closing of this transaction ("Closing") shall be held at the law offices of  Diktas Gillen, P.C.  596 Anderson Avenue, Suite 301, Cliffside Park, NJ 07010, or at such other place as the parties hereto may agree upon.

5.2    <u>Closing Date</u>.  The Closing Date shall on or within forty five (45) days of execution of this Agreement, or such other date and time as parties hereto may agree upon.

5.3    <u>Time of Closing</u>.  The Closing shall commence at 10:00 a.m. on the Closing Date, or at such other time as parties hereto may agree upon.

**6.    <u>Representations and Warranties of Seller</u>.**

6.1    Seller, in order to induce Buyer to enter into this Agreement and to complete Closing, makes the following representations and warranties to Buyer:

(i)    Seller is a limited liability company and owner of the Property. Seller is validly organized, is in good standing and authorized to do business in the State of New Jersey.

(ii)   Seller will within five (5) business days of the execution of this Agreement of Sale by the parties, prepare and file the appropriate documents necessary to obtain the approval of the Bankruptcy Court of the proposed Sale Order.

(iii)  Seller has the full and lawful unrestricted right and power to execute, deliver and perform its obligations under this Agreement and to complete all transactions contemplated hereunder.  Seller has obtained all consents, approvals, and authorizations from all persons, and entities required to enter into this Agreement and to consummate the transactions contemplated hereby.

(iv) There are no rights, options, or other agreements of any kind to purchase or otherwise acquire or sell or otherwise dispose of any of the Property, or any interest therein, nor any claims to such rights, options, or other agreements.

4

4823-7045-2662

(v)  This Agreement is the legal, valid and binding obligation of, and is enforceable against Seller in accordance with its terms, except to the extent such enforcement may be affected by general principles of equity, or by bankruptcy and other laws affecting the rights of creditors generally; the execution and delivery of this Agreement and the compliance with the terms and conditions of this Agreement by Seller, will not breach or conflict with any of the terms, conditions or provisions of any agreement or instrument to which Seller is a party or by which Seller or the Property, is, are, or may be bound, or constitute a default thereunder; and the authorization, execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, will not, with or without the giving of notice or passage of time or both:

(A)  violate, conflict with or result in the breach of any terms or provisions of, or require any notice, filing, or consent under (I) any statutes, laws, rules, or regulations of any governmental body applicable to Seller or the Property; or (II) any judgment, decree, writ, injunction, order or award of any arbitrator, court or governmental authority binding upon Seller or the Property; or

(B)  conflict with, result in the breach of any terms or provisions of, require any notice or consent under, give rise to a right of termination of, or constitute a default under, any agreement or instrument of any kind to which Seller is a party or by which the Property is bound; or

(C)  result in any lien, claim, encumbrance or restriction on the Property.

(vi)  With respect to the Property, as of the date of this Agreement:

(A)    Seller has not received any note or notice of any legal requirement or deficiency concerning the physical condition of the Property, nor any note or notice requiring any work, repairs, construction, or alteration of the Property.

(B)    Seller has not received any note or notice of any unsatisfactory condition of the Property from any insurance company or Board of Fire Underwriters.

(C)    There are no condemnation proceedings pending or threatened against the Property or any part thereof.

(D)    The Property and the existing use and occupancy are in full compliance with all applicable laws, ordinances, rules, regulations, and requirements of all applicable governmental and regulatory authorities having jurisdiction thereof including, without limitation, those pertaining to zoning, building, building setbacks, subdivision, housing, safety, fire, electricity, planning, health, and the storage, handling, treatment, disposal, and production of waste or waste products or hazardous materials of any kind (the "Laws").  To the best of Seller's knowledge, there are no changes pending in the Laws which would affect the operation of the Property or the access to the Property.

5

4823-7045-2662

(E)    The zoning classification of the Property primarily falls within AB, Airport Business zone of Alexandria Township.  The use of the Property complies with the permitted uses under the zoning ordinance.  The zoning ordinance includes minimal bulk and area limitations.  The height limits are those imposed around airports.

(F)    All certificates of use and occupancy, all permits, licenses and the like necessary for the construction, operation, and leasing of the buildings have been validly issued, are without exception or variance, and are in good standing.

(G)    No assessments or notices thereof have been made against or, are threatened or proposed against the Property or any part thereof, which have not been paid in full.

(H)    All environmental control permits, approvals, and licenses, required by any law, ordinance, or by any governmental authority having jurisdiction thereof for the construction or operation of the Property have been obtained by Seller.

(I)    No brokers, real estate agents, or other intermediaries are entitled to or have claimed any leasing or brokerage commissions.

(J)    Industrial, chemical and other wastes and products, the use and disposition of which are regulated by any state, federal or local law or ordinance, have not been stored, treated at or disposed of by Seller on the Property and have never been stored at, treated, or disposed of on the Property.

(K)    The Property is assessed for real estate tax purposes.  All real estate taxes, water and sewer charges and other similar taxes with respect to the Property, to the extent due and payable, will been paid in full at closing.  There are no tax reduction proceedings pending with respect to the Property.

(L)    No casualty, damage or destruction has occurred at the Property which has not been fully repaired and restored.

(M)    Exhibit C contains a correct and complete list of the types and amounts of insurance coverage maintained by Seller and currently in force with respect to the Property.

(N)    The construction of all improvements on the Property and its existing use and occupancy were and are in full compliance with any and all covenants, conditions and restrictions affecting the Property.

(O)    There are no mechanics' liens filed against the Property and there are no claims pending and, to the best of Seller's knowledge, threatened against Seller by any contractor who performed work in the Property during the four months prior to the date hereof.

4823-7045-2662

DocuSign Envelope ID: EB078585DA656A0BEEAA2B183A13C38D5A

(vii)  With regard to all applicable environmental laws:

(A)    To the best of Seller's knowledge, after due inquiry and investigation, the Property shall be free and clear of any violations of the Industrial Site Recovery Act (N.J.S.A. 13:1K-6 *et seq.*) ("ISRA"), the Spill Compensation and Control Act (N.J.S.A. 58:10-23.11 *et seq.*), the Resource Conservation and Recovery Act (42 U.S. §6901 *et seq.*), the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. §9601 *et seq.*), and any other state or federal environmental or occupational health or safety law or regulation and any amendment of or rule, regulation, order, directive or guidance issued thereunder.

(B)    The Seller and all tenants of the property shall not have received any summons, citation, directive, order, claim, litigation, investigation, judgment, letter or other communications, written or oral, actual or threatened, from the New Jersey Department of Environmental Protection ("NJDEP"), the United States Environmental Protection Agency ("USEPA") or other federal, state or local agency or authority, or any other entity or any individual, concerning any intentional or unintentional act or omission which might result in the releasing of any regulated substances in, or under the Property or into the air, waters, groundwater, or onto the land of the State of New Jersey, or into the air or waters outside the jurisdiction of the State of New Jersey where damages may have resulted or may result to the air, lands, waters, groundwater, fish, shellfish, wildlife, biota, or other resources owned, managed, held in trust or otherwise controlled by, or within the jurisdiction of, the State of New Jersey, or into the "environment," as such term is defined in 42 U.S.C. §9601(8).

(C)    The Property and the tenants of the Property shall be in compliance with all federal, state and local environmental laws, ordinances, rules and regulations, applicable to the Seller and tenants or their business, and shall obtain and comply with any and all permits required thereunder; the Seller shall not suffer or permit any intentional or unintentional act or omission of the Seller or any other tenant, occupant, user and/or operator of the Property, resulting in the releasing of regulated substances in, on or under the Property or into the air, waters or groundwater, or onto the lands of the State of New Jersey; Seller shall provide to Buyer copies of all correspondence, reports, notices, orders, findings, declarations and other materials pertinent to this contingency.

6.2    Each of the representations and warranties of Sellers set forth in subsection 6.1 above, shall be deemed to be made again on the Closing Date and shall survive Closing and not merge in the Deed.  Upon termination of the statute of limitations applicable to it, any liability of Seller for any misrepresentation or breach of warranty shall terminate absolutely.

6.3    Seller shall inform Buyer of any facts, transactions, or occurrences of which it becomes aware after the date hereof which would render any of the representations and warranties contained in this Section untrue in any material respect.

6.4    The rights of Buyer to Indemnification hereunder shall not be affected by the fact that Buyer knew or should have known the true state of facts giving rise to such Indemnification unless Buyer had actual knowledge of such facts independent of any information

7

or disclosure provided to Buyer by Seller, and the furnishing of any information to Buyer or its affiliates or representatives or any investigation by Buyer or its affiliates or representatives shall not affect Buyer's right to rely on any representations and warranties made in this Agreement.

**7.    Indemnification by Seller.**

7.1    Seller agrees to Indemnify Buyer against and in respect of the following:

(i)    A breach of any of the representations or warranties of Seller set forth in this Agreement; and

(ii)    Any and all of the following debts, liabilities and obligations of Seller, either direct or indirect, accrued, absolute, contingent or otherwise, and whether known or unknown, or due or payable, fixed or unfixed, choate or inchoate, liquidated or unliquidated, or secured or unsecured:

(A)    those existing prior to, and at, the Closing Date but not arising thereafter; and

(B)    those arising from any contract or commitment entered into or made, or any liabilities, acts, transactions, agreements, understandings or obligations incurred, by Seller (including without limitation obligations incurred prior to Closing as the result of any circumstance or state of facts which occurred or existed prior to Closing, such as a personal injury or property damage which is claimed to have occurred prior to Closing) on or before the Closing Date; and

(iii)    Any and all debts, liabilities and obligations of Seller for United States, state or local taxes, assessments, or similar charges, including interest and penalties with respect thereto (without regard to the time such taxes may accrue or be determined or assessed), which are attributable or related to, or covering any period prior to or during which the Closing occurs, for the portion thereof that ends on or before the close of business on the day of the completion of Closing, and arising out of the Property.

7.2    If any action, suit or other proceeding shall be instituted or threatened against Buyer with respect to any matter as to which Seller shall have any Indemnification obligation under this Agreement, Buyer shall promptly notify Seller of the institution or threat of such proceeding.

**8.    Representations and Warranties of Buyer.**    Buyer makes the following representations and warranties to Seller, each of which representations shall survive Closing for the period of any statute of limitations applicable to it and shall not merge in the Deed:

8.1    Neither the execution and delivery of this Agreement, nor compliance with the terms and conditions of this Agreement by Buyer will breach or conflict with any agreement or instrument to which Buyer is a party or by which it is bound, or constitutes a default thereunder;

4823-7045-2662

and the execution and delivery of this Agreement will not be in violation of or conflict with any of the terms of any law or regulation, order, judgment or decree applicable to Buyer, or to which Buyer is a party, or by which Buyer is bound.

8.2    There is no action, suit or proceeding pending, or, to the actual knowledge of Buyer, threatened against Buyer or any of them with respect to their ability to enter into this Agreement or complete the transactions contemplated hereby in any court or before any federal, state, county, or municipal department, bureau, commission, board or agency or other governmental instrumentality.

8.3    Buyer agrees to Indemnify Sellers with respect to a breach of any of the representations or warranties of Buyer as set forth in this Section 8.

8.4    The rights of Seller to be Indemnified under this Section 8 shall not be affected by the fact that Seller knew or should have known the true state of facts giving rise to such Indemnification, and the furnishing of any information to Seller by Buyer or any investigation by Seller shall not affect Seller's right to rely on any representations or warranties made in this Section 8.

## 9.    Condition of Title.

9.1    As a condition to Buyer's completion of Closing, on the Closing Date title to the Property shall be good and marketable, with title valid of record and insurable by a title insurance company of Buyer's choice authorized to do business in the State of New Jersey; the Property shall be in compliance with all laws, regulations or ordinances of federal, state, county or local entities or agencies having jurisdiction over the Property; there shall be no violations of any easements, covenants and restriction of record, and all easements, covenants and restrictions of records must not render title to the Property unmarketable nor materially interfere with the Buyer's intended use of the Property; the Property survey must show that there are no encroachments onto the Property from adjoining properties or from the Property onto adjoining properties.

9.2    Seller shall be solely responsible for the payment or other satisfaction and discharge of record of all liens against the Property which appear in the Commitment.  If, at Closing, there are any liens or encumbrances which Seller is obligated to remove and discharge, Seller may use any portion of the balance of the Purchase Price to satisfy the same, provided Seller shall simultaneously either deliver to Buyer at the Closing instruments in recordable form and sufficient to discharge such liens and encumbrances of record together with the cost of recording or filing said instruments; or, provided that Seller has made arrangements with the Title Company in advance of Closing, Seller may deposit with Title Company sufficient monies acceptable to and required by Title Company to insure the obtaining and recording of such discharges and the issuance of title insurance to Buyer free and clear of any such liens and encumbrances.

4823-7045-2662

DocuSign Envelope ID: FB078580-A656-40BF-AA22-183A12C38D5A

9.3    Seller covenants and agrees that from the date of this Agreement through the Closing Date, Seller shall not cause or permit any change to occur in the condition of title to the Property as reported in the Commitment except for the removal or discharge of liens or the correction of any title deficiencies as provided for in this Section 9.

9.4    If the Title Company, as a condition to its insuring title to the Property as set forth in Subsection 9.1 above, shall so request, Seller shall execute and deliver to the Title Company an affidavit in the form reasonably required by the Title Company ("Seller's Affidavits").  Seller shall also deliver to the Title Company any instrument or document, including without limitation receipted real estate tax and water and sewer rent bills showing payment of current charges and assessments, as are necessary for the issuance of the title policy described in Subsection 9.1 above.

**10.    Closing Documents to be Delivered by Buyer.**  At Closing, Buyer shall deliver or caused to be delivered to Seller the Purchase Price, as adjusted in accordance with the provisions of this Agreement, and all other documents required for the consummation of the transactions contemplated hereunder.

**11.    Apportionments; Adjustments to Purchase Price; Post-Closing Adjustments.**

11.1    <u>Adjustment for Apportionable Items</u>.

(i)    At Closing, there shall be added to the Purchase Price the sum of (A) any prepaid real estate taxes; (B) any prepaid water and sewer rentals; (C) any prepaid fees for licenses and permits, if any, which remain in effect for the benefit of the Property after Closing; (D) and any prepaid sums due under any of the Service Agreements which are accepted and continued by Buyer;  all of the foregoing to be apportioned pro rata on a per diem basis on and as of the midnight immediately preceding the Closing Date.

(ii)    At Closing, there shall be deducted from the Purchase Price the sum of any (A) unpaid minimum water and sewer rents; (B) any unpaid real estate taxes; (C) accrued liabilities under any Service Agreements; (D) accrued water and sewer charges in excess of fixed minimum charges; and (E) accrued charges for gas, electricity, telephone, steam and other public utilities; all of the foregoing to be apportioned pro rata on a per diem basis as of the midnight immediately preceding the Closing Date.  Seller shall use diligent efforts to cause, not more than five (5) business days prior to the Closing Date, to the extent reasonably practical, all meters measuring the consumption of water, gas, steam, electricity or other utilities to be read, and the deduction from the Purchase Price to be made on account of such utilities pursuant to this Subsection shall be made pursuant to such readings (with a reasonable adjustment to bring down such readings to the midnight immediately preceding the Closing Date); provided, however, that, if and to the extent meter readings cannot be obtained prior to the Closing Date, Closing shall be completed on the basis of the most recent readings and any further adjustments to be made from or in addition to the Purchase Price pursuant to this Subsection shall be calculated after Closing upon the receipt of such readings and the adjustment shall be made at that time (and in such event this Section shall survive Closing until such adjustment is made).

DocuSign Envelope ID: EB0F859D-A656-40BF-AA22-183A12C38D5A

11.2 <u>Transfer and Other Taxes</u>.  The sale contemplated by this Agreement is pursuant to Debtor's Plan.  Accordingly, the sale contemplated herein is free of, and not subjected to any realty transfer tax.  If the sale is not approved as part of the Debtor's Plan, then the Seller shall pay any applicable transfer tax.  The Buyer shall pay any applicable "mansion tax".

11.3 <u>Errors</u>.  If any errors or omissions are made at Closing with respect to any adjustment or proration, or after Closing with respect to any post-Closing adjustment or apportionment, the parties shall make the appropriate corrections promptly after the discovery thereof.  The obligations set forth in this Subsection shall survive Closing for a period of one hundred and twenty (120) days.

**12.    Conditions Precedent to Buyer's Obligation to Complete Closing.**  Buyer and Seller acknowledge and agree that Buyer's obligation to complete Closing hereunder shall be subject to the fulfillment, prior to or at Closing, of the following conditions precedent; provided, however, that Buyer, in Buyer's sole discretion, may elect to waive any thereof:

12.1  Title to the Property shall be as specified in Article 9 hereof.

12.2  The settlement with Sky Manor Airport Partners, LLC shall be approved by final order of the Bankruptcy Court.

12.3  The warranties and representations of Seller specified in Article 6 hereof shall be true and correct in all material respects as of the Closing Date.

12.4  The Title Company shall have issued or committed to the issuance of the title insurance policy described in Subsection 9.1 hereof, containing as exceptions only the Title Encumbrances.  If the Property are the beneficiary of any appurtenant easement granted pursuant to a recorded instrument providing for ingress or egress or for utility service or for any other purpose, such easement shall be insurable, at regular rates, as appurtenant to the Property.

12.5  Seller shall have tendered physical possession of the Property, free of all leases, licenses, or claims or rights of possession except for any leases which the Buyer has agreed to assume pursuant to an Assignment and Assumption of Leases.

12.6  Seller shall have delivered to Buyer all documents and items specified in Article 4 hereof.

12.7  The contingencies stated in Article 13 hereof shall have been satisfied.

12.8  The inspection of the Property by Buyer and the condition of the Property and title thereto shall have been satisfactory to Buyer in its judgment.

12.9  Buyer shall have obtained Bankruptcy Court approval of the Purchase Agreement, and a final and unappealed order permitting the Closing to occur.

11

12.10  Any opposition to the Sale by Bank of America shall be resolved prior to Closing by either Bank of America's consent to the Sale or by Bankruptcy Court Order.

12.11  An agreed upon valid perpetual deed of access or an access easement granting the right of access from the Property to Sky Manor Road for the benefit of the Seller and all subsequent owners of the Property must be recorded in the Office of the Clerk of Hunterdon County.

In the event any of the foregoing conditions precedent to Buyer's obligation to complete Closing are not satisfied prior to or at the Closing (or as otherwise specifically required herein), Buyer shall have the right to terminate this Agreement by written notice to Seller on or prior to the Closing Date.  Thereupon, all deposits are to be promptly returned to Buyer with all accrued interest earned.

**13.    Contingencies/Inspection Period.**

The following shall constitute contingencies, the satisfaction or waiver of which by Buyer shall be conditions precedent to Buyer's obligation to proceed to Closing hereunder:

13.1  <u>Satisfactory Condition of Property</u>.  Buyer shall have inspected the physical and environmental condition of the Property and found it satisfactory to Buyer in all respects.

13.2  <u>Structural Inspection</u>. Buyer shall have inspected all structures and systems located on the Property, including but not limited to an engineering inspection of the roofs, gutters, basements, electrical heating (including the oil tank, if any) air conditioning system, ventilation systems, pools, plumbing, sewer, septic, lead paint and irrigation system.

13.2  Buyer and Seller agree that Buyer, its agents, employees, inspectors and contractors, shall have access to the Property at all reasonable times, during normal business hours for the purpose of conducting any and all inspections required, including appraisals, surveys, and environmental inspection and tests, in all cases using reasonable care to avoid damage to the Property.  Such right shall continue for so long as this Agreement remains in full force and effect.  Buyer shall promptly repair any damage caused to the Property or any part thereof by Buyer or its agents, employees, inspectors or contractors, and shall restore such damaged portion to substantially the same condition as existed prior to such damage.  The provisions and obligations under this subparagraph shall survive Closing hereunder or the earlier expiration or termination of this Agreement.  Seller shall cause its employees and agents to cooperate with Buyer in connection with Buyer's reasonable inspections under this Paragraph, provided that Seller shall not be subject to, or responsible for, any cost or expense in connection therewith

13.3. Buyer shall have forty five (45) days (the "Inspection Period") to inspect the Property, review the results of all tests and in the Buyer's sole and absolute judgment and discretion determine if the Property is acceptable to Buyer. The Inspection Period may be

12

extended only by a written agreement signed by both the Buyer and Seller.  Buyer may terminate this Agreement based on the Inspections, provided that Buyer has provides notice and opportunity for the Seller to cure any or all Inspection issues prior to closing and if the Seller is unable to cure the Inspections by the Closing, the Buyer shall receive the immediate return of the Deposit by giving written termination notice to the Seller on or before the last day of the Inspection Period. If Buyer does not give written termination notice on or before the last day of the Inspection Period, the contingencies in Section 13 hereof shall be deemed waived by the Buyer.

     14.     **Notices.**  All notices, requests and other communications under this Agreement shall be in writing and shall be sent by registered or certified mail, return receipt requested, postage prepaid, or by receipted hand delivery addressed as follows:

If intended for Buyer:

     Evan Samouhos
     EVS Family Brass Farm LLC
     44 Standish Ave
     West Orange, NJ 07052

with a copy to:

     Diktas Gillen, PC
     596 Anderson Avenue, Suite 301
     PO Box 2199
     Cliffside Park, NJ  07010
     Phone: 201-943-8020
     Fax: 201-943-8838
     Attn: Christos J. Diktas, Esquire

If intended for Sellers:

     High Brass Farm Land Holdings LLC
     68 Sky Manor Road
     Pottstown, NJ  08867
     Attn: Michael Merbler

with a copy to:

     Obermayer, Rebmann, Maxwell & Hippel LLP
     1120 Route 73, Suite 420
     Mount Laurel, NJ 08054
     Phone : 215-665-3140
     Fax : 215-665-3165
     Edmond.george@obermayer.com
     Attn:  Edmond M. George, Esquire

4823-7045-2662

or to such other address or addresses or party or parties of which Sellers or Buyer shall have given notice as herein provided. All such notices, requests or other communications shall be deemed to have been sufficiently given for all purposes hereof on the date of the proper mailing thereof, and may be given on behalf of any party by its respective counsel.

**15.** **Modification.** This Agreement may be modified only by a written agreement signed by all parties.

**16.** **Default.**

16.1 <u>Default of Seller</u>. In the event that Seller's title at Closing is not as stipulated in Section 9 hereof, or Closing does not occur on or before the Closing Date, or Seller is otherwise in default in the performance of the provisions hereof, Buyer may either (i) disregard such default and perform this Agreement by accepting said title in such condition as Sellers can convey, with abatement in purchase price solely for monetary liens of an ascertainable amount, or (ii) terminate this Agreement and recover the Deposit plus interest from Seller, or (iii) seek specific performance of Seller's obligations hereunder.

16.2 <u>Default of Buyer</u>. In the event that on the Closing Date Buyer shall be unable to perform its obligations hereunder in accordance with the terms of this Agreement, this Agreement shall be terminated and the Parties are entitled to their damages at law.

**17.** **Damage or Casualty.** In the event a "Casualty," as hereinafter defined shall cause loss or damage to the Property prior to Closing, and such damage shall not have been repaired to Buyer's satisfaction prior to the Closing Date, Buyer shall have the option to either: (i) notify Seller on or prior to Closing, that this Agreement is terminated, and in such event this Agreement shall be void and Buyer and Seller shall have no further Obligation to the other pursuant to this Agreement; or (ii) accept the Property "as is," without abatement of the Purchase Price, provided that all insurance policy proceeds payable to Sellers and to Sellers' mortgagees shall be paid or assigned to Buyer with such Mortgagees' Consent at Closing and shall be sufficient, in Buyer's estimation to repair the damages to the Property. A "Casualty" means any damage to the Property by reason of fire, accident, weather, or any other condition for which the cost of repair exceeds Fifty Thousand Dollars ($50,000.00) in good faith reasonably estimated by Buyer.

**18.** **Bulk Sales Escrow.** Buyer's attorney covenants and agrees that at least ten business days prior to Closing it shall have submitted a Notification of Sale, Transfer or Assignment in Bulk (the "C-9600")to the New Jersey Department of the Treasury, Division of Taxation, Bulk Sales Section with a copy sent to Seller's counsel. Seller's counsel covenants and agrees to provide to the Purchaser's attorney all of the Seller's information required to complete the C-9600. The Seller's information will be provided immediately upon the Seller's execution of this Agreement. Thereafter, upon Closing, Purchaser's attorney shall hold in escrow the amount determined by the Division of Taxation as stated in the bulk sale escrow letter. Funds will be released to the Division of Taxation from the escrow upon receipt of a Demand for Escrow Payment. Any remaining funds in the escrow shall be held pending a final tax clearance

DocuSign Envelope ID: EB078589DA656A0BEFAA22B183A12C28D5A

letter from the Division of Taxation.

**19.    Miscellaneous.**

19.1  Due Diligence.  Seller shall deliver to Buyer for examination, inspection and investigation within three business (3) days of execution of this agreement any and all property information including but not limited to leases and all affordable housing documents, utility invoices, maintenance records, rent rolls (if any), existing service contracts, any and all records and documentation relating to the Property tax classification including but not limited to all Chapter 91 requests and responses, all documents relating to any pending Property tax appeals, current insurance policies and documents relating to any insurance claims, and Seller's Formation Documents confirming ownership of the selling entity together with any additional documents which are necessary in Buyer's sole and absolute judgment and discretion to determine whether the Property is acceptable to Buyer.  Buyer shall have thirty (30) days (the "Document Inspection Period") to inspect the documents provided pursuant to this Section 19.1 and in the Buyer's reasonable judgment and discretion determine if the Property is acceptable to Buyer. The Inspection Period may be extended only by a written agreement signed by both the Buyer and Seller.  Buyer may terminate this Agreement based on the documents, provided that Buyer has provides notice and opportunity for the Seller to cure any or all document issues prior to closing and if the Seller is unable, the Buyer shall receive the immediate return of the Deposit by giving written termination notice to the Seller on or before the last day of the Inspection Period. If Buyer does not give written termination notice on or before the last day of the Inspection Period. the contingencies in this Section 19.1 shall be deemed waived by the Buyer.

19.2  Captions.  The captions and headings in this Agreement are inserted for convenience of reference only, and in no way define, describe, or limit the scope or intent of this Agreement or any of the provisions hereof.

19.3  Time Periods.  Any time periods provided herein which shall end on a Saturday, Sunday, or legal holiday, shall extend to 5:00 p.m. of the next full business day.

19.4  Counterparts.  This Agreement may be executed in any number of identical counterparts, all of which evidence only one agreement and only one of which need be produced for any purpose.

19.5  Whole Agreement.  All understandings and agreements heretofore had between the parties hereto, whether oral or written, are merged into this Agreement which alone fully and completely expresses their agreement.

19.6  Severability.  If any provision of this Agreement shall be declared invalid by judicial determination or by express act of any legislative body with authority to affect this Agreement, only such provision so declared invalid shall be thus affected, and all other provisions not inconsistent therewith or directly dependent thereon shall remain in full force and effect.

15

4823-7045-2662

19.7 <u>Recording</u>.  This Agreement or a memorandum or summary thereof may not be recorded in any office or place of public record by either party hereto.

19.8 <u>Governing Law</u>.  This Agreement shall be governed by and interpreted and enforced in accordance with the laws of the jurisdiction in which the Property are located.

19.9 <u>Operation of the Property</u>.  Seller agrees that from and after the execution date hereof and until Closing, Seller shall continue to operate and manage the Property in accordance with the terms hereof and good business practice, and shall not enter into any new leases or other agreements respecting the Property or amend any current leases without Buyer's written approval.

19.10 <u>Assignment</u>.  Buyer may freely assign its rights and interest in this Agreement and in the Property to any entity in which the parties named herein as Buyer retain a substantial economic interest as partners or shareholders, and may otherwise only assign its rights and interest herein upon receipt of Seller's prior written consent.  This Agreement shall extend to and be binding upon the successors and assigns of Buyer and of the Seller.

The Seller agrees that if the Buyer elects to purchase title in the Property in the name of another entity (the "New Purchaser"), the Seller will, at the Buyer's request, enter into a novation agreement.

19.11 <u>Condemnation.</u>  If at or prior to Closing, all or any portion of the Property are taken by exercise of eminent domain or condemnation, Seller shall give prompt written notice thereof to Buyer and Buyer shall have the option of either: (i) declaring this Agreement terminated by giving notice to Seller in which event this Agreement shall be void and upon the return of the Deposit and any other funds paid under this Agreement neither party hereto shall have any further obligation to the other pursuant to this Agreement; or (ii) accepting the deed to be executed and delivered in accordance with the terms of this Agreement upon payment of the Purchase Price without any abatement by reason of such taking or condemnation provided, however, that Seller shall, at Closing, turn over and deliver to Buyer the net proceeds of any award or other proceeds of such taking which may have been collected by Seller as a result of such taking or if no award or other proceeds shall have been collected by Seller or Seller's agents, deliver to Buyer an assignment of Seller's right to any such award or other proceeds which may be payable as a result of such taking.

19.12 <u>Joint and Several Liability</u>.  The liability hereunder of the individuals named as Seller, as well as the liability hereunder of the individuals named as Buyer, shall be joint and several.

19.13 <u>Construction</u>.  This Agreement shall not be construed more strictly against one party than against the other merely by virtue of the fact that it may have been prepared primarily by counsel of one of the parties, it being recognized that both Buyer and Seller have contributed substantially and materially to the preparation of this Agreement and were represented by counsel in the negotiations and drafting of this Agreement.

16

19.14 <u>Exhibits</u>. Attached to this Agreement and made part hereof are the following Exhibits:

      A.    Property

      B.    FIRPTA Certificate

      C.    Insurance

**IN WITNESS WHEREOF**, and intending to be legally bound hereby, the parties hereto have executed this Agreement on the day and year first above written.

BUYER:

EVS Family Brass Farm LLC

Attest: _____    By: _____
    Name: _____        Name: Evan Samouhos
                     Title:  Managing Member

SELLER:

HIGH BRASS FARM LAND HOLDINGS LLC

Attest: _____    By: _____
    Name: _____        Name: Michael Merbler
                     Title: Managing Member

    ESCROW AGENT
      DIKTAS GILLEN, P.C.

    By: _____
      Name: Christos J. Diktas, Esq.
      Title: Escrow Agent

17

DocuSign Envelope ID: ED078F0D-A656-40BE-AA22-183A13C43D5A

19.14 <u>Exhibits</u>.  Attached to this Agreement and made part hereof are the following Exhibits:

A.    Property

B.    FIRPTA Certificate

C.    Insurance

**IN WITNESS WHEREOF**, and intending to be legally bound hereby, the parties hereto have executed this Agreement on the day and year first above written.

BUYER:

EVS Family Brass Farm LLC

Attest: _____
       Name:

By: _____
    Name: Evan Samouhos
    Title:  Managing Member

SELLER:

HIGH BRASS FARM LAND HOLDINGS LLC

Attest: _____
       Name:

By: _____
    Name: Michael Merbler
    Title: Managing Member

ESCROW AGENT
DIKTAS GILLEN, P.C.

By: _____
    Name: Christos J. Diktas, Esq.
    Title: Escrow Agent

17

4823-7045-2662

EXHIBIT A

To Agreement of Sale

<u>LEGAL DESCRIPTION OF PROPERTY</u>

EXHIBIT B

To Agreement of Sale

<u>SELLER'S FIRPTA CERTIFICATE</u>

     The undersigned, _____ (the "Transferors") are transferring and conveying certain real property to _____ (the "Transferee") pursuant to an Agreement of Sale dated _____.  Section 1445 of the Internal Revenue Code provides that a transferee of a United States real property interest must withhold tax if the transferor of such interest is a foreign person.  To inform the Transferee that withholding of tax is not required upon the transfer of the real property referred to above, the undersigned hereby certify and warrant the following:

       (1)  The Transferors are not nonresident aliens for purposes of U.S. income taxation.

       (2)  The Transferors' U.S. Social Security numbers are _____ and _____.

       (3)  The Transferors' home address is _____.

     The Transferors understand that this certification may be disclosed to the Internal Revenue Service by the Transferee, and that any false statement made herein could be punished by fine, imprisonment, or both.

     The Transferors, under penalties of perjury, declare that this certification is true, correct and complete.

_____(SEAL)


_____(SEAL)

4823-7045-2662

EXHIBIT C

To Agreement of Sale

<u>INSURANCE COVERAGE</u>

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

*Caption in Compliance with D.N.J. LBR 9004-1(b)*
**Edmond M. George, Esquire
Michael D. Vagnoni, Esquire (*pro hac vice*)
OBERMAYER REBMANN MAXWELL & HIPPEL LLP
1120 Route 73, Suite 420
Mount Laurel, NJ 08054-5108
(856) 795-3300**
***Attorneys to Debtor***

In re:

HIGH BRASS FARM LAND HOLDINGS LLC,

             Debtor.

Case No.: 19-25217-MBK

Hearing Date: May 7, 2020

Chapter 11

Judge Michael B. Kaplan

## ORDER AUTHORIZING
## SALE OF REAL PROPERTY

| Recommended Local Form: | ☐ Followed | X  Modified |
|---|---|---|

The relief set forth on the following page two (2) is **ORDERED**.

1

Page -2-

| | |
|---|---|
| **Debtor:** | High Brass Farm Land Holdings LCC |
| **Case No:** | 19-25217-MBK |
| **Caption of Order:** | ORDER GRANTING MOTION OF HIGH BRASS FARM LAND HOLDINGS LLC TO SELL FREE AND CLEAR |

After review of the Debtor's motion for authorization to sell the commercial real property commonly known as 68 Sky Manor Road, Pittstown NJ 08867 (the "Real Property"),

**IT IS** hereby **ORDERED** as follows:

1. The Debtor is authorized to sell the Real Property free and clear of all liens and interests aside from the easement and maintenance agreement with Sky Manor Airport Partners LLC, on the terms and conditions of the contract of sale pursuant to 11 U.S.C. §§ 363(b) and (f), with any divested liens to attach to the proceeds of sale.

2. The sale of the Real Property shall be exempt from any law imposing a stamp tax or similar tax pursuant to 11 U.S.C. § 1146.

3. Other closing fees payable by the Debtor may be satisfied from the proceeds of sale and adjustments to the price as provided for in the contract of sale may be made at closing.

4. The proceeds of sale will be applied first to any costs of sale pursuant to the contract of sale, then to the real estate tax claim held by the Township of Alexandria, then $80,000.00 to Debtor's counsel as a carve-out from payment due to Bank of America pursuant to the Debtor's settlement with Bank of America, then any remaining proceeds to Bank of America.

5. The stay of this Order granting the Motion under Bankruptcy Rule 6004(h) is waived for cause.

# SCHEDULE III

## Deed-In-Lieu

Prepared by:
**David B. Grantz, Esq.**
Meyner and Landis LLP
One Gateway Center, Suite 2500 |
Newark, New Jersey 07102

# <u>DEED</u>

**THIS DEED** is made on the 7th day of May in the year 2020

**FROM:**   **HIGH BRASS FARM LAND HOLDINGS, LLC,** a limited liability company organized and existing under the laws of the State of New Jersey with an address at 68 Sky Manor Road, Pittstown, New Jersey 08887, (referred to as the **"Grantor"**),

**TO:**   **SECOND STEP ASSET MANAGEMENT COMPANY,** a Maryland corporation, organized and existing under the laws of the State of Maryland, with a place of business at 100 S. Charles Street, 3rd Floor, Baltimore, Maryland 21201 (referred to as the **"Grantee"**)

   The words "Grantor" and "Grantee" shall mean all Grantors and all Grantees listed above.

**1.   Transfer of Ownership.**   The Grantor grants and conveys (transfers ownership of) the property described on Schedule "A" annexed hereto (the **"Property"**) to the Grantee. This transfer is made for the sum of $1.00 and other valuable consideration. The Grantee acknowledges receipt of this money.

**2.   Tax Map Reference.** (N.J.S.A. 46:15-1.1):  Township of Alexandria, Hunterdon County, New Jersey, identified as Block No. 21, Lot Nos 38 & 38Q0231.

**3.   Property**.   The Property consists of the land and all the buildings and structures on the land in the Town of Alexandria, County of Hunterdon, and the State of New Jersey. The legal description is:

### SEE "SCHEDULE A" ANNEXED HERETO

**4.   Grant and Conveyance.** The Grantor hereby remises, releases and conveys unto Grantee and Grantee's successors and assigns forever all of Grantor's rights, title and interests, privileges, appurtenances and Grantor's equitable right of redemption in and to the Property, including any and all improvements thereto, which legal description is annexed hereto as Schedule A together with the full release of all of the Grantor's rights, title and interests of every character and kind in and to the Property so that neither the Grantor, nor Grantor's heirs, nor any other person or persons for them or in their names or behalves, shall or will hereafter claim or demand any right, title or interest in or to the aforesaid Property or any part thereof and each of them shall, by this conveyance, be excluded and forever barred from any such claim or demand.

**5.    Conveyance in Lieu of Foreclosure**. This conveyance by Grantor to Grantee is being made in lieu of foreclosure by Grantee of that certain mortgage executed by Grantor and dated on or about July 19, 2010, and thereafter recorded with the Hunterdon County Clerk/Register (hereinafter the "**Mortgage**") to secure a Loan Agreement in the original principal sum of **ONE MILLION FIVE HUNDRED TEN AND NO/100 ($1,510,000.00) DOLLARS**, plus with interest and costs as shown therein (as from time to time amended, the "**Loan Agreement**"). This conveyance by Grantor to Grantee, is being made in lieu of the foreclosure of the Mortgage in compliance with the terms of the Mortgage and the Loan Agreement.

**6.    Absolute Conveyance**.  The conveyance of the Property according to the terms of this Deed is an absolute conveyance of all of Grantor's right, title and interest in and to the Property in fact as well as form and is not intended as a mortgage, trust conveyance, deed of trust, or security instrument of any kind  The consideration for this conveyance is exactly as recited herein, and Grantor has no further interest (including legal and/or equitable rights of redemption) or claims in and to the Property or to the proceeds and profits that may be derived thereof, of any kind whatsoever.

**7.    Promises by Grantor.**   The Grantor promises that the Grantor has done no act to encumber the Property. This promise is called a "Covenant as to grantor's acts" (N.J.S.A. 46:4-6). This promise means that the Grantor has not allowed anyone else to obtain any legal right which affects the Property (such as by making a mortgage or allowing a judgment to be entered against the Grantor).

**8.    No Merger**.  The doctrine of "merger" shall not apply to this conveyance. In furtherance of the foregoing and notwithstanding the existence or the recording of this Deed, all documents that evidence or secure the Grantor's obligations under the Loan Agreement and the Mortgage shall continue and remain in full force and effect after the execution and the recording of this Deed.  Such obligations shall not be deemed cancelled or satisfied in whole or in part by the existence or the recordation of this Deed. Grantee shall maintain the ability to prosecute a foreclosure action and seek an order confirming the conveyance of the Property, along with any other relief provided for by the Loan Agreement, Mortgage, this Deed, or by law

Grantee's interests in the Property, whether under the Mortgage or this Deed, shall not merge with each other and the Mortgage shall be and remain at all times a valid and continuous lien on the Property unless and until affirmatively discharged by Grantee and the monetary obligations owed under the Loan Agreement shall continue.

SIGNATURES ON NEXT PAGE

**IN WITNESS WHEREOF**, Grantor, intending to be legally bound, has duly executed and delivered this Deed as of the day and year first above written.

HIGH BRASS FARM LAND HOLDINGS, LLC

Date: May 7, 2020          By: _____

                                        Michael Merbler
                                        Managing Member

On this 7th day of May 2020, before me, Michael Merbler, personally appeared on behalf of HIGH BRASS FARM LAND HOLDINGS, LLC, and known by me to be an authorized representative of said HIGH BRASS FARM LAND HOLDINGS, LLC, the party executing the foregoing Instrument, and he acknowledged said Instrument to be his free act and deed and the free act and deed of said HIGH BRASS FARM LAND HOLDINGS, LLC.

_____
Notary Public
My Commission Expires:_____
Seal:

## <u>SCHEDULE A</u>: DESCRIPTION OF MORTGAGED PREMISES

**All that certain tract or parcel of land and premises situate, lying, and being in the Township of Alexandria, County of Hunterdon, and State of New Jersey.**

Also known as Block 21, Lots 38 & 38Q0231 on the Tax Map of the Township of Alexandria, County of Hunterdon, State of New Jersey. Being commonly known as 68 Sky Manor Road, Pittstown, New Jersey 08867:

<u>Description of Property</u>

All that tract or parcel of land and premises, situate, lying and being in Township of Alexandria in the County of Hunterdon and State of New Jersey, more particularly described as follows:

BEGINNING known and designated as Lot 38 in Block 21 as shown on map entitled "Final Map Sky Manor Airpark, Township of Alexandria, Hunterdon County New Jersey", dated September 3, 2004, last revised January 6, 2005, prepared by Fisk Associates, P.E. & L.S., Middlesex, New Jersey and filed in the Office of the Hunterdon County Clerk on June 15, 2005 as Instrument #8547128.

BEGINNING at a point in the centerline of Amelia Way, said point being distant 722.39 feet in a Northeasterly direction along said centerline from the centerline of Citrus Lane, and running; thence

(1) along said centerline of Amelia Way, on a curve to the left in a Northeasterly direction having a radius of 150.00 feet, a distance along the arc of 50.97 feet, the chord of said curve bearing North 37 degrees 53 minutes 42 seconds East, a distance of 50.73 feet to a point; thence

(2) leaving said Amelia Way, South 42 degrees 22 minutes 10 seconds East, a distance of 130.00 feet to a point; thence

(3) North 43 degrees 14 minutes 06 seconds East, a distance of 75.00 feet to a point; thence

(4) North 58 degrees 08 minutes 26 seconds East, a distance of 417.87 feet to a point; thence

(5) North 17 degrees 11 minutes 47 seconds West, a distance of 442.04 feet to a point; thence

(6) North 61 degrees 43 minutes 57 seconds East, a distance of 1,091.88 feet to a stone found; thence

(7) North 25 degrees 23 minutes 17 seconds West, a distance of 109.46 feet to a stone found, thence

(8) North 63 degrees 07 minutes 23 seconds East, a distance of 402.51 feet to an iron pin found; thence

(9) South 33 degrees 32 minutes 26 seconds East, a distance of 487.59 feet to an iron pin found, thence

(10) South 35 degrees 31 minutes 59 seconds East, a distance of 53.70 feet to an iron pin found; thence

(11) South 61 degrees 25 minutes 54 seconds West, a distance of 1,073.74 feet to an iron pin found; thence

(12) South 28 degrees 50 minutes 48 seconds East, a distance of 520.32 feet to a concrete monument set; thence

(13) South 56 degrees 45 minutes 52 seconds West, a distance of 702.32 feet to a concrete monument set; thence

(14) South 24 degrees 01 minutes 59 seconds East, a distance of 191.35 feet to a point; thence

(15) South 59 degrees 33 minutes 34 seconds West, a distance of 674.13 feet to a point; thence

(16) North 37 degrees 40 minutes 46 seconds West, a distance of 473.16 feet to a point; thence

(17) North 48 degrees 22 minutes 59 seconds East, a distance of 417.67 feet to a point; thence

(18) North 42 degrees 22 minutes 10 seconds West, a distance of 310.20 to the point and place of BEGINNING

NOTE FOR INFORMATION ONLY:
Being commonly known as Tax Lot 38 & 38Q0231, Block 21, Township of Alexandria, County of Hunterdon, in the State of New Jersey

4

**DEED**


FROM:    **HIGH BRASS FARM LAND HOLDINGS, LLC,** a limited liability company organized and existing under the laws of the State of New Jersey with an address at 68 Sky Manor Road, Pittstown, New Jersey 08887, (referred to as the **"Grantor"**),

TO:    **SECOND STEP ASSET MANAGEMENT COMPANY,** a Maryland corporation, organized and existing under the laws of the State of Maryland, with a place of business at 100 S. Charles Street, 3rd Floor, Baltimore, Maryland 21201 (referred to as the **"Grantee"**)


RECORD & RETURN TO:

David B. Grantz, Esq.
Meyner and Landis LLP
Suite 2500
One Gateway Center
Newark, New Jersey 07102

# SCHEDULE IV

## Stipulation of Dismissal

**MEYNER AND LANDIS LLP**
**David B. Grantz, Esq.**
**Filing Attorney No.: 042981996**
One Gateway Center, Suite 2500
Newark, New Jersey 07102
(973) 602-3466
*Attorneys for Bank of America, N.A.*

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION: HUNTERDON COUNTY
DOCKET NO.: L-000477-18

| | |
|---|---|
| MICHAEL MERBLER, ELIZABETH PERRY-MERBLER, HIGH BRASS FARM LAND HOLDINGS, LLC d/b/a HIGH BRASS FARM, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> SKY MANOR AIRPORT PARTNERS, LLC; FIDELITY NATIONAL TITLE INSURANCE COMPANY OF NEW YORK; NEW JERSEY TITLE INSURANCE COMPANY n/d/b/a CATIC TITLE INSURANCE COMPANY; BANK OF AMERICA, N.A., <br><br> Defendants <br><br> v. <br><br> HIGH BRASS FARM, LLC, <br><br><br> Third-Party Defendant. | *Civil Action* <br><br> ***STIPULATION OF DISMISSAL WITH PREJUDICE OF ALL CLAIMS BY MICHAEL MERBLER, ELIZABETH PERRY-MERBLER, HIGH BRASS FARM LAND HOLDINGS, LLC d/b/a HIGH BRASS FARM, LLC AND HIGH BRASS FARM, LLC AGAINST BANK OF AMERICA, N.A. AND BY BANK OF AMERICA, N.A. AGAINST MICHAEL MERBLER AND ELIZABETH PERRY-MERBLER*** |

      **IT IS HEREBY STIPULATED AND AGREED** that this matter be dismissed, *with prejudice,* only as to the claims and causes of action by Plaintiffs Michael Merbler, Elizabeth Perry-Merbler, High Brass Farm Land Holdings, LLC d/b/a High Brass Farm, LLC, and Third-Party Defendant High Brass Farm, LLC against Bank of America, N.A. and claims and causes of action

by Bank of America, N.A. against Michael Merbler and Elizabeth Perry-Merbler.

**MEYNER AND LANDIS LLP**
*Attorneys for Bank of America, N.A.*

**ASHFORD SCHAEL**
*Attorneys for High Brass Farm, LLC,*
*Michael Merbler and Elizabeth Perry-Merbler*

By: _____
       David B. Grantz, Esq.

By: _____
       Courtney Schael, Esq.

Dated:   May 7, 2020

Dated:   May 7, 2020

**OBERMAYER REBMANN MAXWELL & HIPPEL LLP**
*Attorneys for High Brass Land Holdings, LLC*

By: _____
       Edmond George, Esq.

Dated: May 7, 2020

# SCHEDULE V

## Consent Judgement

**MEYNER AND LANDIS LLP**
**David B. Grantz, Esq.**
**Filing Attorney No.: 042981996**
One Gateway Center, Suite 2500
Newark, New Jersey 07102
(973) 602-3466
*Attorneys for Bank of America, N.A.*

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION: HUNTERDON COUNTY
DOCKET NO.: L-000477-18

MICHAEL MERBLER, ELIZABETH
PERRY-MERBLER, HIGH BRASS FARM
LAND HOLDINGS, LLC d/b/a HIGH
BRASS FARM, LLC,

                Plaintiffs,

     v.

SKY MANOR AIRPORT PARTNERS, LLC;
FIDELITY NATIONAL TITLE INSURANCE
COMPANY OF NEW YORK; NEW
JERSEY TITLE INSURANCE COMPANY
n/d/b/a CATIC TITLE INSURANCE
COMPANY; BANK OF AMERICA, N.A.,

          Defendants

     v.

HIGH BRASS FARM, LLC,

          Third-Party Defendant.

*Civil Action*

***CONSENT JUDGMENT IN FAVOR OF***
***BANK OF AMERICA, N.A. AGAINST***
***THIRD-PARTY DEFENDANT HIGH***
***BRASS FARM, LLC***

    **THIS MATTER** having been jointly opened to the Court by Meyner and Landis LLP, attorneys for defendant/third-party plaintiff, Bank of America, N.A. (David B. Grantz, Esq. appearing), and Courtney Schael, Esq., attorney for third-party defendant High Brass Farm, LLC, and the parties having agreed to enter into this Consent Judgment; and for good cause shown:

IT IS on this _____ day of _____, 2020

That **JUDGMENT** is hereby entered in favor of the third-party plaintiff, Bank of America N.A. (hereinafter "**BofA**"), and against the third-party defendant HIGH BRASS FARM, LLC ("**HB Farm**"), in the total amount of **Twenty Thousand and 00/100 Dollars ($20,000.00)** pursuant to terms of a certain Settlement and Forbearance Agreement entered into by and between BofA and HB Farm; and

**IT IS FURTHER ORDERED** that this Judgment is hereby certified as final in accordance with Rule 4:42-2 et seq.; and it is further

**IT IS FURTHER ORDERED** that a copy of this Consent Judgment shall be served on all parties within seven (7) days from receipt of the Consent Judgment by Third-Party Plaintiff's counsel.

_____
, J.S.C.

Consent to form and entry

**MEYNER AND LANDIS LLP**
Attorneys for Third Party Plaintiff
*Bank of America, N.A.*

**ASHFORD SCHAEL**
Attorneys for Third Party Defendant
*High Brass Farm, LLC*

By: _____
    David B. Grantz, Esq.

By: _____
    Courtney Schael, Esq.

Dated:  May7, 2020

Dated:  May7, 2020

**HIGH BRASS FARM, LLC**

Date: May 7, 2020          By: _____

                                              Michael Merbler
                                              Managing Member


      On this 7th day of May 2020, before me, Michael Merbler, personally appeared on behalf of HIGH BRASS FARM, LLC, and known by me to be an authorized representative of said HIGH BRASS FARM, LLC, the party executing the foregoing Instrument, and he acknowledged said Instrument to be his free act and deed and the free act and deed of said HIGH BRASS FARM, LLC.


_____
Notary Public
My Commission Expires:_____
Seal:

# SCHEDULE VI

# UCC-1 Financing Statement

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
Javier M. Lopez, Esq. - 973-975-3543

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

Meyner and Landis, LLP
One Gateway Center, Suite 2500
Newark, New Jersey 07102

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| High Brass Farm, LLC | | | | |

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 68 Sky Manor Road | Pittstown | NJ | 08867 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Bank of America, N.A. | | | | |

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1 Financial Plaza | Providence | RI | 02903 | USA |

4. This FINANCING STATEMENT covers the following collateral:

(a) All accounts, and all chattel paper, instruments, deposit accounts, letters of credit rights, and general intangibles related thereto, and all returned or repossessed goods which, on sale or lease, resulted in an account; (b) All inventory. (c) All Equipment and fixtures now owned or hereafter acquired by Debtor; (d) All negotiable and nonnegotiable documents of title covering any of Debtor's business assets; (e) All accessions, attachments and other additions to the Debtor's Business Assets, and all tools, parts and equipment used in connection with the Debtor's Business Assets. (f) All substitutes or replacements for any of Debtor's Business Assets, all cash or non-cash proceeds (including insurance proceeds), products, rents and profits of the Debtor's Business Assets, and all income, benefits and property receivable on account of the Debtor's Business Assets, and all supporting obligations covering any of Debtor's Business Assets; (g) All books, data and records pertaining to any of Debtor's Business Assets, whether in the form of a writing, photograph, microfilm or electronic media, including but not limited to any computer-readable memory and any computer software necessary to process such memory.

| 5. ALTERNATIVE DESIGNATION [if applicable]: | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|

| 6. This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
|---|---|---|---|---|

8. OPTIONAL FILER REFERENCE DATA

**FILING OFFICE COPY** — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

# Instructions for UCC Financing Statement (Form UCC1)

Please type or laser-print this form. Be sure it is completely legible. Read all Instructions, especially Instruction 1; correct Debtor name is crucial. Follow Instructions completely.

Fill in form very carefully; mistakes may have important legal consequences. If you have questions, consult your attorney. Filing office cannot give legal advice. Do not insert anything in the open space in the upper portion of this form; it is reserved for filing office use.

When properly completed, send Filing Office Copy, with required fee, to filing office. If you want an acknowledgment, complete item B and, if filing in a filing office that returns an acknowledgment copy furnished by filer, you may also send Acknowledgment Copy; otherwise detach. If you want to make a search request, complete item 7 (after reading Instruction 7 below) and send Search Report Copy, otherwise detach. Always detach Debtor and Secured Party Copies.

If you need to use attachments, you are encouraged to use either Addendum (Form UCC1Ad) or Additional Party (Form UCC1AP).

A. To assist filing offices that might wish to communicate with filer, filer may provide information in item A. This item is optional.

B. Complete item B if you want an acknowledgment sent to you. If filing in a filing office that returns an acknowledgment copy furnished by filer, present simultaneously with this form a carbon or other copy of this form for use as an acknowledgment copy.

1. **Debtor name**: Enter only one Debtor name in item 1, an organization's name (1a) or an individual's name (1b). Enter Debtor's exact full legal name. Don't abbreviate.

1a. Organization Debtor. "Organization" means an entity having a legal identity separate from its owner. A partnership is an organization; a sole proprietorship is not an organization, even if it does business under a trade name. If Debtor is a partnership, enter exact full legal name of partnership; you need not enter names of partners as additional Debtors. If Debtor is a registered organization (e.g., corporation, limited partnership, limited liability company), it is advisable to examine Debtor's current filed charter documents to determine Debtor's correct name, organization type, and jurisdiction of organization.

1b. Individual Debtor. "Individual" means a natural person; this includes a sole proprietorship, whether or not operating under a trade name. Don't use prefixes (Mr., Mrs., Ms.). Use suffix box only for titles of lineage (Jr., Sr., III) and not for other suffixes or titles (e.g., M.D.). Use married woman's personal name (Mary Smith, not Mrs. John Smith). Enter individual Debtor's family name (surname) in Last Name box, first given name in First Name box, and all additional given names in Middle Name box.
   For both organization and individual Debtors: Don't use Debtor's trade name, DBA, AKA, FKA, Division name, etc. in place of or combined with Debtor's legal name; you may add such other names as additional Debtors if you wish (but this is neither required nor recommended).

1c. An address is always required for the Debtor named in 1a or 1b.

1d. Reserved for Financing Statements to be filed in North Dakota or South Dakota only. If this Financing Statement is to be filed in North Dakota or South Dakota, the Debtor's taxpayer identification number (tax ID#) — social security number or employer identification number must be placed in this box.

1e,f,g. "Additional information re organization Debtor" is always required. Type of organization and jurisdiction of organization as well as Debtor's exact legal name can be determined from Debtor's current filed charter document. Organizational ID #, if any, is assigned by the agency where the charter document was filed; this is different from tax ID #; this should be entered preceded by the 2-character U.S. Postal identification of state of organization if one of the United States (e.g., CA12345, for a California corporation whose organizational ID # is 12345); if agency does not assign organizational ID #, check box in item 1g indicating "none."

*Note:* If Debtor is a trust or a trustee acting with respect to property held in trust, enter Debtor's name in item 1 and attach Addendum (Form UCC1Ad) and check appropriate box in item 17. If Debtor is a decedent's estate, enter name of deceased individual in item 1b and attach Addendum (Form UCC1Ad) and check appropriate box in item 17. If Debtor is a transmitting utility or this Financing Statement is filed in connection with a Manufactured-Home Transaction or a Public-Finance Transaction as defined in applicable Commercial Code, attach Addendum (Form UCC1Ad) and check appropriate box in item 18.

2. If an additional Debtor is included, complete item 2, determined and formatted per Instruction 1. To include further additional Debtors, attach either Addendum (Form UCC1Ad) or Additional Party (Form UCC1AP) and follow Instruction 1 for determining and formatting additional names.

3. Enter information for Secured Party or Total Assignee, determined and formatted per Instruction 1. To include further additional Secured Parties, attach either Addendum (Form UCC1Ad) or Additional Party (Form UCC1AP) and follow Instruction 1 for determining and formatting additional names. If there has been a total assignment of the Secured Party's interest prior to filing this form, you may either (1) enter Assignor S/P's name and address in item 3 and file an Amendment (Form UCC3) [see item 5 of that form]; or (2) enter Total Assignee's name and address in item 3 and, if you wish, also attaching Addendum (Form UCC1Ad) giving Assignor S/P's name and address in item 12.

4. Use item 4 to indicate the collateral covered by this Financing Statement. If space in item 4 is insufficient, put the entire collateral description or continuation of the collateral description on either Addendum (Form UCC1Ad) or other attached additional page(s).

5. If filer desires (at filer's option) to use titles of lessee and lessor, or consignee and consignor, or seller and buyer (in the case of accounts or chattel paper), or bailee and bailor instead of Debtor and Secured Party, check the appropriate box in item 5. If this is an agricultural lien (as defined in applicable Commercial Code) filing or is otherwise not a UCC security interest filing (e.g., a tax lien, judgment lien, etc.), check the appropriate box in item 5, complete items 1-7 as applicable and attach any other items required under other law.

6. If this Financing Statement is filed as a fixture filing or if the collateral consists of timber to be cut or as-extracted collateral, complete items 1-5, check the box in item 6, and complete the required information (items 13, 14 and/or 15) on Addendum (Form UCC1Ad).

7. This item is optional. Check appropriate box in item 7 to request Search Report(s) on all or some of the Debtors named in this Financing Statement. The Report will list all Financing Statements on file against the designated Debtor on the date of the Report, including this Financing Statement. There is an additional fee for each Report. If you have checked a box in item 7, file Search Report Copy together with Filing Officer Copy (and Acknowledgment Copy). Note: Not all states do searches and not all states will honor a search request made via this form; some states require a separate request form.

8. This item is optional and is for filer's use only. For filer's convenience of reference, filer may enter in item 8 any identifying information (e.g., Secured Party's loan number, law firm file number, Debtor's name or other identification, state in which form is being filed, etc.) that filer may find useful.

# SCHEDULE VII

**Bank of America Release of High Brass Farm LLC**

# *To all to whom these Presents shall come or may Concern, Know That*

**BANK OF AMERICA, N.A.,** as RELEASOR, a national banking association organized and existing under the laws of the United States, holder a Commercial Loan in the amount of $1,510,000 dated July 19, 2010 (the "**Loan**"), evidenced by a Loan agreement signed by **HIGH BRASS FARM, LLC,** as RELEASEE.

**RELEASOR,** its successors, assigns, parents, subsidiaries, affiliates, predecessors, employees, agents, as applicable, both present and former (collectively, the "**RELEASOR Affiliates**"), jointly and severally, release and forever discharge the RELEASEE, its subsidiaries, affiliates, officers, directors, employees, successors and assigns, both present and former (collectively the "**RELEASEE Affiliates**") of and from any and all manner of action and actions, cause and causes of action, suits, debts, controversies, damages, judgments, executions, claims and demands whatsoever, asserted or unasserted, in law or in equity which against RELEASEE and/or the RELEASEE Affiliates they ever had, now have or which any of the RELEASOR and/or RELEASOR Affiliates, as applicable, both present and former ever had or now has, upon or by reason of any manner, cause, causes or thing whatsoever, including, without limitation, any presently existing claim or defense whether or not presently suspected, contemplated or anticipated that relates to, in whole or in part, directly or indirectly, the Loan, the loan modification dated April 5, 2016, and/or the Settlement and Forbearance Agreement dated May 2020.

**IN WITNESS WHEREOF,** the RELEASOR has caused this RELEASE to be executed by its authorized officer on on _____, **2020**.

**IN PRESENCE OF:**                                    **BANK OF AMERICA, N.A.**


                                              By: _____


STATE OF _____        )
                                ) ss.:
COUNTY OF _____          )

On _____, **2020**, before me, the undersigned, personally appeared _____ personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is(are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
NOTARY PUBLIC

# SCHEDULE VIII

## Stipulation of Settlement

**MEYNER AND LANDIS LLP**
**David B. Grantz, Esq.**
**Filing Attorney No.: 042981996**
One Gateway Center, Suite 2500
Newark, New Jersey 07102
(973) 602-3466
*Attorneys for Bank of America, N.A.*

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION: HUNTERDON COUNTY
DOCKET NO.: L-000477-18

MICHAEL MERBLER, ELIZABETH
PERRY-MERBLER, HIGH BRASS FARM
LAND HOLDINGS, LLC d/b/a HIGH
BRASS FARM, LLC,

Plaintiffs,

v.

SKY MANOR AIRPORT PARTNERS, LLC;
FIDELITY NATIONAL TITLE INSURANCE
COMPANY OF NEW YORK; NEW
JERSEY TITLE INSURANCE COMPANY
n/d/b/a CATIC TITLE INSURANCE
COMPANY; BANK OF AMERICA, N.A.,

Defendants

v.

HIGH BRASS FARM, LLC,

Third-Party Defendant.

*Civil Action*

***STIPULATION OF SETTLEMENT
RELATED TO BANK OF AMERICA,
N.A.'S CLAIMS AGAINST HIGH BRASS
FARM, LLC ONLY***

**IT IS HEREBY STIPULATED AND AGREED** between

Defendant/Counterclaimant/Third Party Plaintiff Bank of America, N.A. ("BofA") and Third-Party

Defendant High Brass Farm, LLC ("HB Farm") as follows:

**Whereas,** BofA and HB Farm have settled BofA's claims against HB Farm by virtue of a

certain Settlement and Forbearance Agreement dated May 7, 2020 (the "Settlement Agreement"), which terms are hereby referenced and incorporated herein;

Whereas, HB Farm has executed and delivered a certain Consent Judgment in favor of BofA to be held in escrow by BofA so long as there is no default under the Settlement Agreement;

NOW THEREFORE, in consideration of the promises and for good and valuable consideration, the receipt whereof is acknowledged, BofA and HB Farm each hereto agree as follows:

1.       In the event that HB Farm or High Brass Farm Land Holdings, LLC ("HB Land") defaults under the Settlement Agreement, BofA shall serve notice of default on HB Farm, with a copy to counsel by first class mail and electronic mail, which mailing shall be sufficient service of the notice of default, and HB Farm shall have ten (10) days from the date of the notice of default to cure said default. If the default is not cured within the ten (10) day cure period, BofA may proceed to file the Consent Judgment referenced in the Settlement Agreement, along with an Affidavit of Default, with the Superior Court of New Jersey, Hunterdon Vicinage, pursuant to the Settlement Agreement and this Stipulation and on notice to counsel.  Upon receipt of the filed Consent Judgment from the Superior Court, BofA may submit the filed Consent Judgment to the Civil Judgment and Order Docket for filing as a statewide lien and may enforce the provisions of the Consent Judgment through the Sheriff or by any other means permitted by law.

2.       In the event that  HB Farm and HB Land do not default under the Settlement Agreement, then BofA shall deliver the Consent Judgment to counsel within forty (45) days of satisfaction of HB Farm's and HB Land's obligations under the Settlement Agreement.

2

3. The above captioned matter is hereby marked "settled" as to BofA's claims against the HB Farm and those claims are dismissed, ***without prejudice*** to the rights of the parties hereunder to reopen this matter solely to enforce the terms of this Stipulation of Settlement.

**MEYNER AND LANDIS LLP**
*Attorneys for Bank of America, N.A.*

**ASHFORD SCHAEL LLC**
*Attorneys for High Brass Farm, LLC,*

By: _____
      David B. Grantz, Esq.

By: _____
      Courtney Schael, Esq.

Dated:   May 7, 2020

Dated:   May 7, 2020

**SCHEDULE IX**

**Bank of America Release of High Brass Land Holdings LLC**

# *To all to whom these Presents shall come or may Concern, Know That*

**BANK OF AMERICA, N.A.,** as RELEASOR, a national banking association organized and existing under the laws of the United States, holder a Commercial Loan in the amount of $1,510,000 dated July 19, 2010 (the "**Loan**"), evidenced by a Loan agreement signed by **HIGH BRASS FARM LAND HOLDINGS, LLC,** as RELEASEE.

**RELEASOR,** its successors, assigns, parents, subsidiaries, affiliates, predecessors, employees, agents, as applicable, both present and former (collectively, the "**RELEASOR Affiliates**"), jointly and severally, release and forever discharge the RELEASEE, its subsidiaries, affiliates, officers, directors, employees, successors and assigns, both present and former (collectively the "**RELEASEE Affiliates**") of and from any and all manner of action and actions, cause and causes of action, suits, debts, controversies, damages, judgments, executions, claims and demands whatsoever, asserted or unasserted, in law or in equity which against RELEASEE and/or the RELEASEE Affiliates they ever had or now have including, without limitation, any presently existing claim or defense whether or not presently suspected, contemplated or anticipated that relates solely to, in whole or in part, directly or indirectly, the Loan.

**IN WITNESS WHEREOF,** the RELEASOR has caused this RELEASE to be executed by its authorized officer on on \_\_\_\_\_, **2020.**

**IN PRESENCE OF:**                                    **BANK OF AMERICA, N.A.**

By: _____

STATE OF _____     )
                                                          ) ss.:
COUNTY OF _____     )

On \_\_\_\_\_, **2020,** before me, the undersigned, personally appeared _____ personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is(are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
NOTARY PUBLIC